JACK ADAMS, CLAUDE BROWN, HENRY DAVIS, THURMAN AND RODA M. LAWRENCE AND CROW HILL PROPERTIES (A PARTNERSHIP) v. NORTH CAROLINA DEPARTMENT OF NATURAL AND ECONOMIC RESOURCES AND NORTH CAROLINA COASTAL RESOURCES COMMISSION

AND

ALPHIOUS K. EVERETT, SR., RAY HARTSFIELD, JR., JULIUS B. PARKER AND LISTON YOPP v. NORTH CAROLINA DEPARTMENT OF NATURAL AND ECONOMIC RESOURCES AND NORTH CAROLINA COASTAL RESOURCES COMMISSION

No. 28

(Filed 28 November 1978)

1. Statutes § 2.1— distinction between local and general act

A general law defines a class which reasonably warrants special legislative attention and applies uniformly to everyone in the class, while a

local act unreasonably singles out a class for special legislative attention or, having made a reasonable classification, does not apply uniformly to all members of the designated class.

2. **Statutes § 2.9; Waters and Watercourses § 7— Coastal Area Management Act—coastal counties—valid legislative class**

The coastal counties constitute a valid legislative class for the purpose of addressing the special and urgent environmental problems found in the coastal zone, since, according to the legislative findings of G.S. 113A-102, the coastal lands and waters are among the State's most valuable resources; the coastal area is among the most biologically productive regions of the State and the nation; coastal waters and marshlands provide almost 90% of the most productive sport fisheries on the east coast of the U. S.; the coastal area has a high recreational and esthetic value which should be preserved; and in recent years the coastal area has been subjected to increasing pressures resulting from the expansion of industrial development, population and recreational needs.

3. **Waters and Watercourses § 7— Coastal Area Management Act—boundary of coastal area—seawater encroachment criterion**

Plaintiffs' contention that the General Assembly did not properly define the inland limits of the coastal sounds in the Coastal Area Management Act of 1974 and hence unreasonably excluded from the coverage of the Act counties which were coastal in nature is without merit, since, in order to determine the inland limits of the coastal sounds and hence the western boundary of the coastal areas, the General Assembly had to decide where the salty, marshy, coastal sounds ended and the fresh water coastal rivers began; the criterion ultimately adopted by the General Assembly was "the limit of seawater encroachment" on a given coastal river under normal conditions; and the western boundary of the coastal zone as determined by use of the seawater encroachment criterion was reasonably related to the purpose of the Act.

4. **Administrative Law § 1— delegation of legislative authority—requirements**

The constitutional inhibition against delegating legislative authority does not preclude the legislature from transferring adjudicative and rule-making powers to administrative bodies provided such transfers are accompanied by adequate guiding standards to govern the exercise of the delegated powers.

5. **Administrative Law § 1; Waters and Watercourses § 7—Coastal Area Management Act—proper delegation of authority to Coastal Resources Commission—guidelines—procedural safeguards**

The Coastal Area Management Act of 1974 properly delegates authority to the Coastal Resources Commission to develop, adopt and amend the State guidelines for the coastal area, since the Act provides that the State guidelines will be consistent with goals of the coastal area management system as set forth in G.S. 113A-102; the legislative findings in G.S. 113A-102(a) and the criterion for designating areas of environmental concern in G.S. 113A-113 provide further specific standards to aid the Coastal Resources Commission in the formulation of State guidelines; the goals, policies and criteria outlined in these statutes provide the Commission with an adequate notion of the legislative parameters within which they are to operate in the exercise of their

delegated powers; and the General Assembly has subjected the actions of the Commission to an extensive system of procedural safeguards.

**6. Declaratory Judgment Act § 3— Coastal Area Management Act—unconstitutional taking of land alleged—no justiciable controversy**

Plaintiffs' contention that the Coastal Area Management Act of 1974 effected an unconstitutional taking of their land was properly dismissed in a declaratory judgment action since, at the time the action was brought, plaintiffs had no occasion to seek development permits, variances or exemptions from coverage under the Act, and they could therefore only speculate as to the effect the Act would have on the usefulness and value of their specific plots of land; such speculation did not constitute a controversy justiciable under the Declaratory Judgment Act.

**7. Declaratory Judgment Act § 3— Coastal Area Management Act—improper warrantless search power alleged—no justiciable controversy**

In a declaratory judgment action where plaintiffs alleged that the Coastal Area Management Act of 1974 authorized warrantless searches violative of the Fourth Amendment, there was no justiciable controversy with respect to that issue and the trial court properly dismissed it since plaintiffs did not allege that they had been subjected to actual searches or that they had been fined pursuant to G.S. 113A-126(d)(1)c for refusing access to investigators.

Justice COPELAND dissenting.

Justice BRITT took no part in the consideration or decision of this case.

APPEAL by plaintiffs in each case from judgment of *Walker*, *S.J.*, 30 November 1977, at a special sitting of CARTERET Superior Court.

Plaintiffs Jack Adams, et al., instituted their action on 5 November 1976. Plaintiffs Alphious K. Everett, Sr., et al., instituted their action on 24 March 1977. Upon joint motion of plaintiffs and defendants these actions were consolidated for trial on 29 August 1977.

In this consolidated action, brought under the Declaratory Judgment Act, plaintiffs attack the constitutionality of the Coastal Area Management Act of 1974, G.S. 113A-100, *et seq.*, hereinafter referred to as the Act. Plaintiffs allege in pertinent part:

1. That the Act is a prohibited local act under Article II, section 24 of the North Carolina Constitution.

2. That the Act delegates authority to the Coastal Resources Commission (hereinafter referred to as CRC) to develop and adopt

"State Guidelines" for the coastal area without providing adequate standards to govern the exercise of the power delegated in violation of Article I, section 6 and Article II, section 1 of the North Carolina Constitution.

3. That the provisions of the Act, and the State guidelines adopted by the CRC, deprive them of their property without due process of law in violation of the Fifth and Fourteenth Amendments and in violation of Article I, section 19 of the North Carolina Constitution.

4. That Section 113A-126 of the Act authorizes warrantless searches by the CRC which are repugnant to the Fourth Amendment of the United States Constitution and Article I, section 20 of the North Carolina Constitution.

5. That the guidelines for the coastal area promulgated by the CRC exceed the powers delegated by the Act and are impermissibly inconsistent with the goals of the Act as set forth in Section 113A-102.

The Coastal Area Management Act of 1974 is a "cooperative program of coastal area management between local and state governments." (G.S. 113A-101). Its basic objective is to "establish a comprehensive plan for the protection, preservation, orderly development and management of the coastal area of North Carolina." (G.S. 113A-102(a) ).

Primary responsibility for implementing the Act is given to a fifteen-member citizen panel, the CRC, all but three of whom must have expertise in a specific phase of coastal activity such as commercial fishing, coastal engineering, coastal agriculture or coastal land development, or in local government in the twenty-county coastal area. Twelve of the fifteen are nominees of local government; all are appointed by the Governor. (G.S. 113A-104).

The CRC is assisted by the Coastal Resources Advisory Council (CRAC), composed of representatives appointed by each of the twenty coastal counties, plus four from coastal multi-county planning groups and eight from coastal towns and cities, as well as marine scientists and representatives of State agencies involved in coastal programs (G.S. 113A-105(b) ).

The coastal area is generally defined as including all counties bordering the Atlantic Ocean or one of the coastal sounds. G.S. 113A-103(2).

A number of activities, including certain agricultural activities, are exempted from coverage of the Act by G.S. 113A-103(5)b.

Four basic mechanisms are utilized by the Act to accomplish its objectives:

> I. STATE GUIDELINES FOR THE COASTAL AREA ARE TO BE PROMULGATED BY THE CRC. G.S. 113A-106 through 108.

The CRC is to develop State guidelines for the coastal area, specifying objectives, policies and standards to be followed in public and private use of land and water in the coastal area. These guidelines are to give particular attention to the nature of development which shall be appropriate within the various types of area of environmental concern designated by the CRC. (See Part III, infra.) G.S. 113A-107. The State guidelines have a threefold effect. All county land use plans (see Part II, infra) must be consistent with the guidelines. All development permits granted (see Part IV, infra) must be consistent with the guidelines. Finally, all land policies of the State relating to acquisition, use, disposition, and classification of coastal land shall be consistent with the guidelines. G.S. 113A-108.

> II. LAND USE PLANS ARE TO BE ADOPTED BY EACH COUNTY WITHIN THE COASTAL AREA. G.S. 113A-109 through 112.

A land use plan is to "consist of statements of objectives, policies, and standards to be followed in public and private use of land within the county" which shall be supplemented by maps showing the appropriate location of particular types of land or water use in particular areas. The plan shall give special attention to the protection and appropriate development of areas of environmental concern designated by the CRC. G.S. 113A-110(a). If a coastal county fails to adopt a land use plan the CRC shall promptly prepare such a plan. G.S. 113A-109. The land use plans are to be consistent with the State guidelines promulgated by the CRC. G.S. 113A-110(a). No land use plan shall become effective until it is approved by the CRC. G.S. 113A-110(f). The county land use plans have a twofold effect. No development permit shall be

issued under Part IV (infra) which is inconsistent with the approved land use plan for the county in which the development is proposed. G.S. 113A-111. No local ordinance or regulation shall be adopted within an area of environmental concern (see Part III, infra) which is inconsistent with the land use plan of the county in which said ordinance or regulation is effected. *Id.*

III. DESIGNATION OF AREAS OF ENVIRONMENTAL CONCERN BY THE CRC THROUGH RULE MAKING. G.S. 113A-113 through 115.

"The [CRC] shall by rule designate geographic areas of the coastal area as areas of environmental concern and specify the boundaries thereof. . . ." G.S. 113A-113(a). In specifying areas of environmental concern (AEC) the CRC is to consider the criteria listed in G.S. 113A-113(b). "Prior to adopting any rule permanently designating any [AEC] the Secretary and the [CRC] shall hold a public hearing in each county in which lands to be affected are located, at which public and private parties shall have the opportunity to present comment and views." G.S. 113A-115(a). The CRC shall review the designated AEC's at least biennially. New AEC's may be added and others deleted in accordance with the procedures outlined above.

IV. PERMITS MUST BE OBTAINED FOR DEVELOPMENT WITHIN AEC's. G.S. 113A-116 through 125.

Every person before undertaking any development in any AEC must obtain a permit. G.S. 113A-118(a). Permits for major developments are obtained from the CRC and permits for minor developments are obtained in the first instance from the county in which the development is to take place. Permits for major development are obtained through a formal, quasi-judicial proceeding. G.S. 113A-122. All permit applicants for major development are entitled to a hearing in which evidence is taken and the rules of procedure applicable to civil actions are followed insofar as practicable. A transcript of this hearing is forwarded to the CRC which renders a decision supported by findings of fact and conclusions of law. *Id.* Any person directly affected by any final decision or order of the CRC may appeal to the superior court for judicial review. G.S. 113A-123. Permits for minor development are procured from the designated local official pursuant to an expedited system of review. These expedited procedures are for-

mulated at the local level. G.S. 113A-121. Any person directly affected by a decision of the designated local official may request a hearing before the CRC. *Id.* The procedure followed at this hearing is identical to that followed at hearings for major development permits. G.S. 113A-122.

The trial court upheld in all respects the constitutionality of the Act and the State guidelines promulgated by the CRC. Plaintiffs appealed to the Court of Appeals, and we allowed motion to bypass that court to the end that initial appellate review be had in the Supreme Court.

*Turner, Enochs, Foster & Burnley by C. Allen Foster, Wendell H. Ott and E. Thomas Watson, attorneys for plaintiffs appellant.*

*Rufus L. Edmisten, Attorney General; A. C. Dawson III, Assistant Attorney General; W. A. Raney, Jr., Special Deputy Attorney General, for defendants appellee.*

*John S. Curry, attorney for Amicus Curiae (Natural Resources Defense Council, Inc.; Sierra Club; Conservation Council of North Carolina; New Hope Chapter of the National Audubon Society in support of appellees.)*

HUSKINS, Justice:

Plaintiffs challenge the constitutionality of the Act on two grounds: (1) The Act constitutes local legislation prohibited by Article II, section 24 of the North Carolina Constitution; and (2) The Act unconstitutionally delegates authority to the Coastal Resources Commission (CRC) to develop and adopt "State guidelines" for the coastal area.

The scope of review exercised by this Court when passing on the constitutionality of a legislative act is well stated in *Glenn v. Board of Education*, 210 N.C. 525, 187 S.E. 781 (1936):

"It is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people."

*Accord, McIntyre v. Clarkson*, 254 N.C. 510, 119 S.E. 2d 888 (1961). Implicit in this presumption of constitutionality accorded to legislative acts is the principle that this Court and the General Assembly "are coordinate branches of the state government. Neither is the superior of the other." *Nicholson v. Education Assistance Authority*, 275 N.C. 439, 168 S.E. 2d 401 (1969). In passing upon the constitutionality of a legislative act it is not for this Court to judge its wisdom and expediency. These matters are the province of the General Assembly. Rather, it is the Court's duty to determine whether the legislative act in question exceeds constitutional limitation or prohibition. "If there is a conflict between a statute and the Constitution, this Court must determine the rights and liabilities or duties of the litigants before it in accordance with the Constitution, because the Constitution is the superior rule of law in that situation." *Id.* Thus, this Court "will not disturb an act of the law-making body unless it runs counter to a constitutional limitation or prohibition." *McIntyre v. Clarkson, supra.*

The first issue for consideration is whether the Act is a *local act* prohibited by Article II, section 24 of the Constitution or is a *general law* which the General Assembly has the power to enact.

In distinguishing between a general law and a local act it is important to note at the outset that Article XIV, section 3 of the Constitution expressly provides that: "General laws may be enacted for classes defined by population or other criteria." In *Surplus Co. v. Pleasants, Sheriff*, 264 N.C. 650, 142 S.E. 2d 697 (1965), we said: "For the purposes of legislating, the General Assembly may and does classify conditions, persons, places and things, and classification does not render a statute 'local' if the classification is reasonable and based on rational difference of situation and condition." Thus, the mere fact that a statute applies only to certain units of local government does not by itself render the statute a prohibited local act. Only if the statutory classification is unreasonable or under-inclusive will the statute be voided as a prohibited local act.

[1] The above discussion indicates that the distinguishing factors between a valid general law and a prohibited local act are the related elements of reasonable classification and uniform application. A general law defines a class which reasonably warrants

special legislative attention and applies uniformly to everyone in the class. On the other hand, a local act unreasonably singles out a class for special legislative attention or, having made a reasonable classification, does not apply uniformly to all members of the designated class. In sum, the constitutional prohibition against local acts simply commands that when legislating in certain specified fields the General Assembly must make rational distinctions among units of local government which are reasonably related to the purpose of the legislation. A law is general if "any rational basis reasonably related to the objective of the legislation can be identified which justifies the separation of units of local government into included and excluded categories." Ferrell, "Local Legislation in the North Carolina General Assembly," 45 N.C.L. Rev. 340, 391 (1967). This rule of reasonable classification was formally announced in *McIntyre v. Clarkson, supra,* and reaffirmed in *Treasure City, Inc. v. Clark,* 261 N.C. 130, 134 S.E. 2d 97 (1964); *Surplus Co. v. Pleasants, Sheriff, supra; Smith v. County of Mecklenburg,* 280 N.C. 497, 187 S.E. 2d 67 (1972).

Plaintiffs make a two-part argument in support of their position that the Act constitutes a prohibited local act. First they contend the General Assembly may not reasonably distinguish between the coast and the remainder of the State when enacting environmental legislation; and next, that even if the coast is sufficiently unique to justify separate environmental legislation, the twenty counties covered by the Act do not embrace the entire area necessary for the purposes of the legislation. We will address these arguments *seriatim.*

[2] In support of the first contention plaintiffs argue that the natural resources and environmental needs of the coastal counties are not sufficiently unique to warrant special legislative treatment in the form of "a comprehensive plan for the protection, preservation, orderly development, and management of the coastal area of North Carolina." G.S. 113A-102(a). We disagree. The legislative findings on their face highlight the importance of the unique and exceptionally fragile coastal ecosystem:

"§ 113A-102. *Legislative findings and goals.* — (a) Findings. — It is hereby determined and declared as a matter of legislative finding that among North Carolina's most valuable

resources are its coastal lands and waters. The coastal area, and in particular the estuaries, are among the most biologically productive regions of this State and of the nation. Coastal and estuarine waters and marshlands provide almost ninety percent (90%) of the most productive sport fisheries on the east coast of the United States. North Carolina's coastal area has an extremely high recreational and esthetic value which should be preserved and enhanced.

In recent years the coastal area has been subjected to increasing pressures which are the result of the often-conflicting needs of a society expanding in industrial development, in population, and in the recreational aspirations of its citizens. Unless these pressures are controlled by coordinated management, the very features of the coast which make it economically, esthetically, and ecologically rich will be destroyed. The General Assembly therefore finds that an immediate and pressing need exists to establish a comprehensive plan for the protection, preservation, orderly development, and management of the coastal area of North Carolina."

The following passages from 46 N.C.L. Rev. 779 and 49 N.C.L. Rev. 889-90 help to convey the exceptional qualities of the coastal zone which make it so important to this State and the nation:

"The vast estuarine areas of North Carolina—'those coastal complexes where fresh water from the land meets the salt water of the sea with a daily tidal flux'— are exceeded in total area only by those of Alaska and Louisiana. Estuarine areas include bays, sounds, harbors, lagoons, tidal or salt marshes, coasts, and inshore waters in which the salt waters of the ocean meet and are diluted by the fresh waters of the inland rivers. In North Carolina, this encompasses extensive coastal sounds, salt marshes, and broad river mouths exceeding 2,200,000 acres. These areas are one of North Carolina's most valuable resources.

*     *     *     *

This vast array of land and water combines to provide one of the largest relatively unspoiled natural areas on the eastern coast of the United States. . . . This massive

ecosystem provides food, cover, nesting and spawning areas for countless finfish, shellfish, waterfowl, and fur and game animals."

The above cited legislative findings are confirmed by the trial record and indicate that the unique, fragile and irreplaceable nature of the coastal zone and its significance to the public welfare amply justify the reasonableness of special legislative treatment. We conclude that the coastal counties constitute a valid legislative class for the purpose of addressing the special and urgent environmental problems found in the coastal zone. *Accord, Toms River Affiliates v. Department of Environmental Protection*, 140 N.J. Super. 135, 355 A. 2d 679 (1976); *Meadowlands Regional Development Agency v. State*, 112 N.J. Super. 89, 270 A. 2d 418 (1970), *aff'd*. 63 N.J. 35, 304 A. 2d 545 (1973). *See generally, Turnpike Authority v. Pine Island*, 265 N.C. 109, 143 S.E. 2d 319 (1965).

Plaintiffs' contention that the environmental problems of the mountains and piedmont are equally deserving of legislative attention is not a valid constitutional objection to the Act in light of our finding that the coastal area is sufficiently unique to warrant special legislative attention. "[T]here is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the Legislature must be held rigidly to the choice of regulating all or none. . . . It is enough that the present statute strikes at the evil where it is felt, and reaches the class of cases where it most frequently occurs." *Silver v. Silver*, 280 U.S. 117, 74 L.Ed. 221, 50 S.Ct. 57 (1929). *See generally, Mobile Home Sales v. Tomlinson*, 276 N.C. 661, 174 S.E. 2d 542 (1970).

[3] In the second part of their argument plaintiffs contend the General Assembly did not properly define the inland limits of the coastal sounds in G.S. 113A-103(3) and hence unreasonably excluded from the coverage of the Act counties which were coastal in nature. It should be noted that the inland limits of the coastal sounds in effect constitute the western boundaries of the coastal zone for purposes of the Act.

Plaintiffs' argument requires us to consider whether the General Assembly, in defining the inland limits of the coastal sound, drew boundary lines which were reasonably related to the

purposes of the Act. In determining this issue it is well to note that "[w]hile substantial distinctions . . . are essential in classification, the distinctions need not be scientific or exact. The Legislature has wide discretion in making classifications." *McIntyre v. Clarkson, supra.* Thus, in reviewing the General Assembly's definition of the inland limits of the coastal sounds this Court recognizes that the constitutional prohibition against local legislation does not require a perfect fit; rather, it requires only that the legislative definition be reasonably related to the purpose of the Act. The following passage from Justice Holmes explains the reason why the law-making body generally has broad discretion in making classifications and illuminates the nature of the task faced by the General Assembly in defining the inland limits of the coastal sounds:

> "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself, without regard to the necessity behind it, the line or point seems arbitrary. It might as well, or nearly as well, be a little more to one side or the other. But when it is seen that a line or a point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say it is very wide of any reasonable mark. [Citation omitted.]" *Louisville Gas Co. v. Coleman,* 277 U.S. 32, 72 L.Ed. 770, 48 S.Ct. 423 (1928) (dissenting opinion).

To evaluate the legislative definition of the inland limits of the coastal sounds in its proper context, we must first examine the definition of coastal area in G.S. 113A-103(2). The coastal area is defined as those counties "that (in whole or in part) are adjacent to, adjoining, intersected by or bounded by the Atlantic Ocean . . . or any coastal sound." This statutory definition of coastal area accurately reflects the unique geography of our coastal area. Some coastal counties are bounded by the Atlantic Ocean while others are bounded not by the ocean but by shallow, swampy, fertile coastal sounds which lie to the landward side of our extensive system of barrier islands known as the Outer

Banks. The coastal sounds, of course, are the heart of the coastal area. *See generally,* Note, 49 N.C.L. Rev. 888-92 (1971).

These saltwater coastal sounds are in turn fed by the fresh water coastal rivers. One of the unique features of the North Carolina coastal zone is that its salty coastal sounds are contiguous with the fresh water coastal rivers. In fact, the sounds represent the mouths of the coastal rivers. *See generally,* G.S. 113A-103(3) for the names of the coastal sounds and rivers. Thus, in order to determine the inland limits of the coastal sounds and hence the western boundary of the coastal areas the General Assembly had to decide where the salty, marshy, coastal sounds ended and the fresh water coastal rivers began.

It is evident from the record that the boundaries of the coastal area could not be formulated with mathematical exactness. Affected by a number of varying conditions, the reaches of saltwater intrusion and tidal influence vary markedly from time to time and are thus incapable of exact determination. The criterion ultimately chosen by the General Assembly to distinguish the salty coastal sounds from the fresh water coastal rivers which fed into the sounds was "the limit of seawater encroachment" on a given coastal river under normal conditions. G.S. 113A-103(3). In effect, the limits of the coastal sounds were defined as those points on the coastal rivers where the salt content of the water measured below a scientifically determined amount.

The General Assembly added two refinements to the seawater encroachment criterion. The limits of seawater encroachment were legislatively established as the confluence of a given coastal river with an easily identifiable tributary near to but not always at the points indicated as the farthest inland reach of seawater encroachment. G.S. 113A-103(3). Given the difficulty of determining the precise location of the inland extent of seawater encroachment, we think the points of confluence provided a convenient method of implementing the seawater encroachment criterion. The General Assembly also excluded from the coverage of the Act all counties which adjoined a point of confluence and lay entirely west of said point. *Id.* Two counties— Jones and Pitt—were excluded from the coverage of the Act as a result of this exemptive clause. The record shows that these coun-

ties were not coastal in nature and contained insignificant quantities of coastal wetlands. We agree with the conclusion of the trial court that the slight extent of seawater encroachment into these two counties was of no significance to an accurate and reasonable definition of the coastal area.

We conclude that the western boundary of the coastal zone as determined by use of the seawater encroachment criterion is reasonably related to the purpose of the Act. The record shows, and a look at any map of eastern North Carolina will confirm, that the twenty counties included within the purview of the Act under the statutory definition of coastal area are the counties which are substantially bounded by the large open bodies of water which may be logically, scientifically, or otherwise, considered to be coastal sounds. The coastal area as defined includes all those counties which intimately affect the quality of North Carolina's valuable estuarine waters. We thus hold that the Act is a general law which the General Assembly had power to enact.

Since we hold that the Act is a general law we need not determine whether it relates to or regulates one of the subjects as to which the Constitution prohibits local legislation. *See* N.C. Const., art. II, § 24.

The second issue for determination is whether the Act unconstitutionally delegates authority to the CRC to develop, adopt and amend "State guidelines" for the coastal area. *See* G.S. 113A-107.

[4]  Article I, section 6 of the North Carolina Constitution provides that the legislative, executive and judicial branches of government "ought to be forever separate and distinct from each other." Legislative power is vested in the General Assembly by Article II, section 1 of the Constitution. From these constitutional provisions we glean the bedrock principle "that the legislature may not abdicate its power to make laws or delegate its *supreme* legislative power to any coordinate branch or to any agency which it may create." *Turnpike Authority v. Pine Island, supra.* It is obvious that if interpreted literally the Constitution would absolutely preclude any delegation of legislative power. However, it has long been recognized by this Court that the problems which a modern legislature must confront are of such complexity that strict adherence to ideal notions of the non-delegation doctrine

would unduly hamper the General Assembly in the exercise of its constitutionally vested powers. *See, e.g., Turnpike Authority v. Pine Island, supra; Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310 (1953). A modern legislature must be able to delegate—in proper instances—"a *limited* portion of its legislative powers" to administrative bodies which are equipped to adapt legislation "to complex conditions involving numerous details with which the Legislature cannot deal directly." *Turnpike Authority v. Pine Island, supra,* 265 N.C. at 114; *Coastal Highway v. Turnpike Authority, supra,* 237 N.C. at 60. Thus, we have repeatedly held that the constitutional inhibition against delegating legislative authority does not preclude the legislature from transferring adjudicative and rule-making powers to administrative bodies provided such transfers are accompanied by adequate guiding standards to govern the exercise of the delegated powers. *See, e.g., Hospital v. Davis,* 292 N.C. 147, 232 S.E. 2d 698 (1977); *Guthrie v. Taylor,* 279 N.C. 703, 185 S.E. 2d 193 (1971), *cert. denied,* 406 U.S. 920 (1972), and cases cited therein.

The task of determining whether a particular delegation is accompanied by *adequate guiding standards* is not a simple one. The difficulties involved in making that determination were succinctly summarized by Justice Sharp, now Chief Justice, in *Jernigan v. State,* 279 N.C. 556, 184 S.E. 2d 259 (1971): "The inherent conflict between the need to place discretion in capable persons and the requirement that discretion be in some manner directed cannot be satisfactorily resolved." In her commentary the Chief Justice clearly perceives that the purpose of the adequate guiding standards test is to reconcile the legislative need to delegate authority with the constitutional mandate that the legislature retain in its own hands the supreme legislative power. *See generally, Guthrie v. Taylor, supra.* In applying this test we must recognize that if the General Assembly is to legislate effectively it must have the capacity in proper instances to delegate authority to administrative bodies. On the other hand, it is our duty to insure that all such delegations are indeed necessary and do not constitute a total abdication by the General Assembly. We concur in the observation that "[t]he key to an intelligent application of this [test] is an understanding that, while delegations of power to administrative agencies are necessary, such transfers of power should be closely monitored to insure that the decision-making by the agency is not arbitrary and unreasoned and that the agency is

not asked to make important policy choices which might just as easily be made by the elected representatives in the legislature." Glenn, The Coastal Management Act in the Courts: A Preliminary Analysis, 53 N.C.L. Rev. 303, 315 (1974).

In the search for adequate guiding standards the primary sources of legislative guidance are declarations by the General Assembly of the legislative goals and policies which an agency is to apply when exercising its delegated powers. We have noted that such declarations need be only "as specific as the circumstances permit." *Turnpike Authority v. Pine Island, supra. See also, Jernigan v. State, supra.* When there is an obvious need for expertise in the achievement of legislative goals the General Assembly is not required to lay down a detailed agenda covering every conceivable problem which might arise in the implementation of the legislation. It is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances.

Additionally, in determining whether a particular delegation of authority is supported by adequate guiding standards it is permissible to consider whether the authority vested in the agency is subject to procedural safeguards. A key purpose of the adequate guiding standards test is to "insure that the decision-making by the agency is not arbitrary and unreasoned." Glenn, *supra.* Procedural safeguards tend to encourage adherence to legislative standards by the agency to which power has been delegated. We thus join the growing trend of authority which recognizes that the presence or absence of procedural safeguards is relevant to the broader question of whether a delegation of authority is accompanied by adequate guiding standards. *See* K. Davis, 1 Administrative Law Treaties, § 3.15 at p. 210 (2d ed. 1978).

[5] Applying these principles to the case *sub judice* we conclude that the Act properly delegates authority to the CRC to develop, adopt and amend State guidelines for the coastal area.

The State guidelines are designed to facilitate state and local government compliance with the planning and permit-letting aspects of the Act. G.S. 113A-108. Land use plans adopted by the coastal counties must be consistent with the guidelines. *Id.* No permit for development within the AEC's shall be granted which

is inconsistent with the guidelines. *Id.* Finally, State land policies governing the acquisition, use, and disposition of land by State departments and agencies and any State land classification system must be consistent with the guidelines. *Id.*

The Act states that "State guidelines for the coastal area shall consist of statements of objectives, policies, and standards to be followed in public and private use of land and water areas within the coastal area." G.S. 113A-107(a). The Act then provides: "Such guidelines shall be consistent with the goals of the coastal area management system as set forth in G.S. 113A-102." *Id.* These legislative goals are spelled out as follows in subsection (b) of G.S. 113A-102:

"(b) Goals.—The goals of the coastal area management system to be created pursuant to this Article are as follows:

(1) To provide a management system capable of preserving and managing the natural ecological conditions of the estuarine system, the barrier dune system, and the beaches, so as to safeguard and perpetuate their natural productivity and their biological, economic and esthetic values;

(2) To insure that the development or preservation of the land and water resources of the coastal area proceeds in a manner consistent with the capability of the land and water for development, use, or preservation based on ecological considerations;

(3) To insure the orderly and balanced use and preservation of our coastal resources on behalf of the people of North Carolina and the nation;

(4) To establish policies, guidelines and standards for:

a. Protection, preservation, and conservation of natural resources including but not limited to water use, scenic vistas, and fish and wildlife; and management of transitional or intensely developed areas and areas especially suited to

intensive use or development, as well as areas of significant natural value;

b. The economic development of the coastal area, including but not limited to construction, location and design of industries, port facilities, commercial establishments and other developments;

c. Recreation and tourist facilities and parklands;

d. Transportation and circulation patterns for the coastal area including major thoroughfares, transportation routes, navigation channels and harbors, and other public utilities and facilities;

e. Preservation and enhancement of the historic, cultural, and scientific aspects of the coastal area;

f. Protection of present common-law and statutory public rights in the lands and waters of the coastal area;

g. Any other purposes deemed necessary or appropriate to effectuate the policy of this Article."

We also note that the legislative findings in G.S. 113A-102(a) and the criteria for designating AEC's in G.S. 113A-113 provide further specific standards to aid the CRC in the formulation of State guidelines.

In our view the declarations of legislative findings and goals, articulated in G.S. 113A-102 and the criteria for designating AEC's in G.S. 113A-113 are "as specific as the circumstances permit." *Turnpike Authority v. Pine Island, supra.* In reaching this conclusion we note that the process of developing and adopting detailed land use guidelines for the complex ecosystem of the coastal area is an undertaking that requires much expertise. Legislative recognition of this need is reflected in the composition of the CRC, which is to consist of fifteen members—twelve of whom are required to have expertise in different facets of coastal

problems. G.S. 113A-104. The goals, policies and criteria outlined in G.S. 113A-102 and G.S. 113A-113 provide the members of the CRC with an adequate notion of the legislative parameters within which they are to operate in the exercise of their delegated powers.

In addition to providing the CRC with a comprehensive set of legislative standards, the General Assembly has subjected the actions of the CRC to an extensive system of procedural safeguards. In effect, the General Assembly has furnished both the standards which are to guide the CRC in the exercise of its delegated powers and a procedural framework which insures that the CRC will perform its duties fairly and in a manner consistent with legislative intent.

There are four sources of procedural safeguards: (1) those provided by the Act, (2) those contained in the North Carolina Administrative Procedure Act (APA), (3) the Administrative Rules Review Committee created by G.S. 120-30.26 and (4) the "Sunset" legislation enacted by the 1977 General Assembly, G.S. 143-34.10, *et seq.*

Initially, section 113A-107 of the Act sets forth in detail the procedures to be followed by the CRC in the adoption and amendment of the State guidelines. These include submission of the proposed guidelines for review and comment to the public, to cities, counties, and lead regional organizations, to all State, private, federal, regional and local agencies which have special expertise with respect to environmental, social, economic, esthetic, cultural, or historical aspects of coastal development. Copies of the adopted guidelines must be filed with both Houses of the Legislature and the Attorney General. The CRC is also to mail copies of the adopted guidelines to all cities, counties, lead regional organizations, and to appropriate citizens and agencies. These broad provisions for input and review by groups representing all levels and types of agencies and interests provide a substantial curb against arbitrary and unreasoned action by the CRC. Additionally, the guidelines must be reviewed by the CRC every five years, although they may be reviewed from time to time as necessary. G.S. 113A-107(f). Any proposed amendments must follow these same procedures for public scrutiny before they can be adopted. Certified copies of any amendments must be filed with the Legislature.

Secondly, amendments to the State guidelines by the CRC are considered administrative rule-making under G.S. 150A-10 and thus subject to the comprehensive additional safeguards contained in the Administrative Procedure Act. G.S. 150A-1 *et seq.* The APA sets forth specific and mandatory guidelines for rule-making, including requirements for public hearings and publication of all agency rules. The mandatory provisions of the APA must now be read as complementing the procedural safeguards in the Act itself. *See* G.S. 150A-9 through 17.

Thirdly, pursuant to G.S. 120-30.24 *et seq.*, all rules adopted by the CRC are subject to review by a permanent committee of the Legislative Research Commission known as the Administrative Rules Committee. The purpose of this legislative scrutiny is to determine whether the agency whose rules are under review "acted within its statutory authority in promulgating the rule." G.S. 120-30.28(a). An elaborate review procedure is established whereby the Administrative Rules Committee and the Legislative Research Commission lodge objections to a particular rule with the appropriate agency. If the agency does not act upon the recommendations of the Commission, the Commission "may submit a report to the next regular session of the General Assembly recommending legislative action." G.S. 120-30.33.

Finally, under the "Sunset" legislation, entitled "Periodic Review of Certain State Agencies," G.S. 143-34.10 *et seq.*, the CRC is subjected to review by the Governmental Evaluations Commission, G.S. 143-34.16 and .17; to public hearings held by the Governmental Evaluations Commission, G.S. 143-34.18; and to hearings and recommendations of legislative committees. G.S. 143-34.19. The Act will stand repealed effective 1 July 1981 unless revived by legislative action. G.S. 143-34.12.

We conclude that the authority delegated to the CRC is accompanied by adequate guiding standards in the form of legislative declarations of goals and policies, and procedural safeguards. We therefore hold that the General Assembly properly delegated to the CRC the authority to prepare and adopt State guidelines for the coastal area.

[6] At the trial of this case plaintiffs contended the Act effected an unconstitutional taking of their land and that the Act authorized warrantless searches violative of the Fourth Amendment. At

the close of plaintiffs' evidence, the trial judge ruled that no genuine and justiciable controversy existed as to these issues and granted defendants' motion to dismiss on these issues. Plaintiffs assign this ruling as error.

We have said many times that "an action for a declaratory judgment will lie only in a case in which there is an actual or real existing controversy between parties having adverse interests in the matter in dispute." *Lide v. Mears*, 231 N.C. 111, 56 S.E. 2d 404 (1949). *See generally, Consumers Power v. Power Co.*, 285 N.C. 434, 206 S.E. 2d 178 (1974), and cases cited therein. An actual controversy between the parties is a jurisdictional prerequisite for a proceeding under the Declaratory Judgment Act in order to "preserve inviolate the ancient and sound juridic concept that the inherent function of judicial tribunals is to adjudicate genuine controversies between antagonistic litigants with respect to their rights, status, or other legal relations." *Lide v. Mears, supra.* As Justice Seawell stated in *Tryon v. Power Co.*, 222 N.C. 200, 22 S.E. 2d 450 (1942): "The [Declaratory Judgment Act] does not require the court to give a purely advisory opinion which the parties might, so to speak, put on ice to be used if and when occasion might arise." In sum, the sound principle that judicial resources should be focused on problems which are real and present rather than dissipated on abstract, hypothetical or remote questions, is fully applicable to the Declaratory Judgment Act. *See generally,* K. Davis, Administrative Law Text, § 21.01 at p. 396 (3d ed. 1972).

We now proceed to determine whether plaintiffs allege an actual, genuine existing controversy with respect to the "taking" and "search" issues.

The gist of plaintiffs' contention on the taking issue is that designation of their land as an "interim" area of environmental concern by the CRC, G.S. 113A-114, and as a "conservation area" by the local land-use plans, in practical effect determines that their property will be formally designated eventually as an AEC under G.S. 113A-115 and that all applications for development permits will be denied on the ground that all development is inconsistent with the classification of their property as a conservation area. *See* G.S. 113A-120(a)(7).

We think it apparent that there has been no "taking" of plaintiffs' property which gives rise to a justiciable controversy at this time. Plaintiffs' assertion that their property has been "taken" by the Act rests on *speculative* assumptions concerning which a declaratory judgment will not be rendered. "It is no part of the function of the courts, in the exercise of the judicial power vested in them by the Constitution, to give advisory opinions, or to answer moot questions, or to maintain a legal bureau for those who may chance to be interested, for the time being, in the pursuit of some academic matter." *Poore v. Poore*, 201 N.C. 791, 161 S.E. 532 (1931).

A brief examination of relevant provisions of the Act demonstrates that plaintiffs' apprehension of diminished land values is premature and hence not justiciable.

At the outset we note that permits must be sought to develop land which falls within an AEC. G.S. 113A-118. It is further noted that the designation of land as an interim AEC under G.S. 113A-114 "does not subject development to a permit requirement; it merely requires the developer to give the state sixty days notice before undertaking the proposed activity." Schoenbaum, The Management of Land and Water Use in the Coastal Zone: A New Law is Enacted in North Carolina, 53 N.C.L. Rev. 275, 290 (1974). Before an area can be designated as an AEC the CRC must engage in full-blown administrative rule-making with public participation and consideration of factors enumerated in G.S. 113A-113. Before a permit request can be granted or denied the CRC must hold a quasi-judicial hearing and make written findings of fact and conclusions of law. G.S. 113A-122. An applicant may appeal the decision of the CRC to the superior court and then to the Court of Appeals as a matter of right. G.S. 113A-123; G.S. 7A-27(b). Significantly, the Act also provides that in his appeal of a permit denial the applicant may also litigate the question whether denial of a permit constitutes a taking without just compensation. G.S. 113A-123(b). Moreover, the Act exempts certain activities from its coverage, G.S. 113A-103(5)b, and also permits landowners to request a variance from the CRC. G.S. 113A-120(c).

It is evident that plaintiffs are in no position at this point to obtain a declaratory judgment determining whether the provi-

sions of the Act have impermissibly impaired the usefulness and value of their land. At the time this case was tried few determinations which could lead to a genuine controversy over the taking of plaintiffs' land had been made. Although some land had been designated as an AEC, no development permits were required until 1 March 1978, the "permit changeover date" designated by the Secretary of the Department of Natural and Economic Resources pursuant to G.S. 113A-125. *See* G.S. 113A-118(a). The remainder of plaintiffs' land was designated as an "interim" AEC and was not subject to a permit requirement. Thus, at the time this case was tried plaintiffs had no occasion to seek development permits, variances, or exemptions from coverage. Hence, they could only speculate as to the effect the Act would have on the usefulness and value of their specific plots of land. A "suspicion" that all development permits within AEC's will be denied does not constitute a controversy within the meaning of our cases. *Tryon v. Power Co., supra.* Accordingly, we affirm the ruling of the trial judge that there is no justiciable controversy on the taking issue entitling plaintiffs to relief under the Declaratory Judgment Act.

[7]  For similar reasons we conclude that plaintiffs do not allege an actual or presently existing controversy with respect to the "search" issue. G.S. 113A-126(d)(1)c permits the CRC to assess a civil penalty of not more than one thousand dollars against any person who refuses entry to premises — "not including any occupied dwelling house or curtilage" — to an official of the CRC who is conducting an investigation authorized by the Act. Plaintiffs contend this provision authorizes warrantless searches in violation of the Fourth Amendment. However, plaintiffs did not allege that they had been subjected to actual searches or that they had been fined for refusing access to investigators. Since plaintiffs failed to allege a controversy as to an actual search it follows that the trial court was without jurisdiction to pass upon the constitutionality of this provision.

Plaintiffs contend the State guidelines adopted by CRC dealing with land-use planning in the coastal area, 15 NCAC 7B, exceed the authority granted by the Act and therefore the guidelines so adopted are void. Plaintiff's argument on this issue, however, is couched in generalities which make it difficult for us to pinpoint where and in what manner the State guidelines adopted by CRC allegedly exceed the authority granted to it. *Cf.*

*State v. Kirby*, 276 N.C. 123, 171 S.E. 2d 416 (1970). Nonetheless, we have examined the guidelines in light of the arguments and find the arguments unpersuasive. Further discussion will serve no useful purpose. This assignment is overruled.

Plaintiffs contend the trial court erred in excluding plaintiffs' Exhibit No. 35. Plaintiffs argue that this exhibit was relevant to the determination of the local act issue. Conceding, without deciding, that the trial court erred in excluding plaintiffs' Exhibit No. 35, we are of the opinion that admission of this exhibit would not have changed the result on the local act issue and its exclusion, if error, was harmless error. *See State v. Cross*, 284 N.C. 174, 200 S.E. 2d 27 (1973); 1 Stansbury's North Carolina Evidence § 9 (Brandis Rev. 1973).

For the reasons stated the judgments appealed from are

Affirmed.

Justice BRITT took no part in the consideration or decision of this case.

Justice COPELAND dissenting.

Article II, Section 24 of the North Carolina Constitution declares that "[t]he General Assembly shall not enact any local, private or special act or resolution" which falls within certain designated categories. Thus, there must be a two-prong analysis to determine whether a law is a prohibited local act or a valid general one.

First, the act in question must be local, which means,

"primarily at least, a law that in fact, if not in form, is confined within territorial limits other than that of the whole state, ... or [applies] to the property and persons of a limited portion of the state, ... or is directed to a specific locality or spot, as distinguished from a law which operates generally throughout the state." *McIntyre v. Clarkson*, 254 N.C. 510, 518, 119 S.E. 2d 888, 893 (1961).

By necessity, however, this Court has recognized that not every valid law does by definition apply equally to all areas of the State.

"A law is general in the constitutional sense when it applies to and operates uniformly on all members of any class of persons, places or things *requiring* legislation peculiar to itself in matters covered by the law." *State v. Dixon,* 215 N.C. 161, 171, 1 S.E. 2d 521, 526 (1939) (Barnhill, J., concurring), quoted in *McIntyre v. Clarkson, supra* at 520, 119 S.E. 2d at 895. (Emphasis added.)

An examination of the Coastal Area Management Act (the Act) itself warrants the conclusion that this piece of legislation is nothing more than a device enabling the implementation of conservation and land-use management. G.S. 113A-102(b) sets forth the goals of the Act, which include insuring the development and preservation of the land, water and natural resources and setting guidelines for economic development, recreation facilities, historical and cultural enhancement and transportation in the coastal area. While these results are unquestionably desirable, no one would seriously contest that they can and should apply to all of North Carolina.

It is important to note that the Act merely lays out these broad policies and sets up the system by which the goals are to be reached, specifically through a Coastal Resources Commission and a Coastal Resources Advisory Council working with local governments. I do not doubt that economic, conservation and environmental problems differ significantly among various areas throughout the State. However, these problems are specifically dealt with outside the Act by the bodies set up for that purpose.

The trial court overlooked this fact when it found that "[a] comprehensive management plan of the type envisioned by the CAMA would be beneficial in dealing with problems in other regions of North Carolina, however, the uniqueness of the problems in the coastal area provided a rational basis for inclusion of the counties covered by the Act." In fact, the legislation in question does not even attempt to deal with these "unique" problems. Furthermore, a comprehensive statewide land-use management act is possible, viable and reasonable. *See, e.g.,* Land Policy Act of 1974, N.C.G.S. §§ 113A-150 *et seq.*

The majority of this Court cites the legislative findings and goals in G.S. 113A-102 as signifying the importance and uniqueness of our coastal area, such that it can be singled out for this special treatment. The Mountain Area Management Act, Senate Bill 973, 1973 Session, which was introduced the same time as the

Coastal Area Management Act but was not enacted, states its legislative goals in proposed § 113A-137.

> "It is hereby determined and declared as a matter of legislative finding that the mountain area including its land and water resources is one of the most valuable areas of North Carolina. The forest and mineral resources of the region are of major importance to the economy of the State and nation. The clear and unpolluted streams, the vast forests, and the scenic vistas of the mountain region make it one of the most esthetically pleasing regions of the State and nation. Because of these features the mountain area of North Carolina has an extremely high recreational and esthetic value which should be preserved and enhanced.
>
> The mountain area in recent years has been subjected to increasing pressures which are the result of the often conflicting needs of a society expanding in industrial development, in population, and in the recreational aspirations of its citizens. Unless these pressures are controlled by coordinated management, the very features of the mountain area which make it economically, esthetically and ecologically rich will be destroyed. The General Assembly, therefore, finds that an immediate and pressing need exists to establish a comprehensive plan for the protection, preservation, orderly development, and management of the mountain area of North Carolina.

This language is virtually identical in all possible respects to G.S. 113A-102, quoted above in the majority opinion.

The second question which must be answered to determine if a law is a prohibited local act is whether it falls within one of the subject matters listed in N.C. Const. art. 2, § 24. The trial court found that the Act "relates to health, sanitation and the abatement of nuisances and to non-navigable streams and CAMA regulates labor, trade, mining and manufacturing." It thus determine that the Act comes within three of the categories listed in our Constitution.

Although defendants except to this finding, I feel that their argument is without merit. For instance, G.S. 113A-102 dictates that guidelines must be set as to "economic development of the

coastal area, including but not limited to construction, location and design of industries, port facilities, commercial establishments and other developments." Clearly these relate to the regulation of trade. Moreover, the same section of the Act states that "water resources shall be managed in order to preserve and enhance water quality." Again, I do not see how water pollution does not relate to "health, sanitation, and the abatement of nuisances." *See also* Glenn, *The Coastal Area Management Act in the Courts: A Preliminary Analysis,* 53 N.C.L. Rev. 303, 306-07 (1974).

In summary, the North Carolina Constitution forbids the Legislature to enact local laws that deal with certain topics. It was determined that concern over these subject matters embrace the entire State. The Coastal Area Management Act is such a prohibited local law; therefore, it is unconstitutional.

For the foregoing reason, I respectfully dissent.