HOPE—A WOMEN'S CANCER CENTER, P.A., AND RALEIGH ORTHOPAEDIC CLINIC, P.A., PLAINTIFFS v. STATE OF NORTH CAROLINA; MICHAEL F. EASLEY, GOVERNOR OF THE STATE OF NORTH CAROLINA, IN HIS OFFICIAL CAPACITY; NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; DEMPSEY E. BENTON, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; DAN A. MYERS, M.D., CHAIRMAN OF THE NORTH CAROLINA STATE HEALTH COORDINATING COUNCIL, IN HIS OFFICIAL CAPACITY; JEFF HORTON, ACTING DIRECTOR, DIVISION OF HEALTH SERVICE REGULATION, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY; AND LEE B. HOFFMAN, CHIEF OF THE CERTIFICATE OF NEED SECTION, DIVISION OF HEALTH SERVICE REGULATION, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HER OFFICIAL CAPACITY, DEFENDANTS

No. COA09-844

(Filed 4 May 2010)

**1. Declaratory Judgment— Certificate of Need law—summary judgment properly denied**

The trial court did not err in denying plaintiffs' motion for judgment on the pleadings seeking a declaratory judgment that provisions of the Certificate of Need (CON) law were unconstitutional as applied to plaintiffs. The CON law does not improperly delegate legislative authority to the North Carolina State Coordinating Council (Council) as the Council's role is strictly advisory and the General Assembly has provided an adequate system of procedural safeguards.

**2. Constitutional Law— substantive due process—Certificate of Need law—no violation**

The Certificate of Need (CON) law did not violate plaintiffs' constitutional right to substantive due process of law. The legitimate purpose of enacting the CON law was to protect the health and welfare of North Carolina citizens by providing affordable access to necessary health care. Furthermore, it is a reasonable belief that this goal would be achieved by allowing approval of new institutional health services only when a need for such services had been determined and the CON law contains detailed explanations as to how the requirement of a CON based on need promotes the public welfare.

**3. Constitutional Law— Certificate of Need law—right of access to the courts—lack of standing—access not denied**

Plaintiffs did not have standing to assert the argument that the Certificate of Need (CON) law, in connection with the Admin-

istrative Procedures Act and the North Carolina Administrative Code, denied them access to the courts. Moreover, even if plaintiffs had standing, their argument lacked merit as a CON decision is an administrative decision which is not constitutionally entitled to judicial review or appeal.

Appeal by plaintiffs from order entered 26 March 2009 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 11 January 2010.

*Nelson Mullins Riley & Scarborough, L.L.P., by Noah H. Huffstetler, III, Denise M. Gunter, Wallace C. Hollowell, III, Stephen D. Martin, and Elizabeth B. Frock; and North Carolina Institute for Constitutional Law, by Robert F. Orr, Executive Director and Senior Counsel and Jason B. Kay, Senior Staff Attorney, for plaintiffs-appellants.*

*Roy Cooper, Attorney General, by Mark A. Davis, Special Deputy Attorney General and Angel Gray, Assistant Attorney General, for defendants-appellees.*

*Bode, Call & Stroupe, L.L.P., by Robert V. Bode and S. Todd Hemphill, for North Carolina Hospital Association, North Carolina Baptist Hospital, and Wake Forest University Health Sciences, amici curiae.*

*Poyner Spruill LLP, by Kenneth L. Burgess and Jessica M. Lewis, for The North Carolina Health Care Facilities Association, amicus curiae.*

*K&L Gates LLP, by Gary S. Qualls and William W. Stewart, Jr., for The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System, Cumberland County Hospital System, Inc. d/b/a Cape Fear Valley Health System, High Point Regional Health System, Pitt County Memorial Hospital, Inc., and Rex Hospital, Inc., amici curiae.*

*North Carolina Justice Center, by Jack Holtzman, for North Carolina Justice Center, amicus curiae.*

*Smith Moore Leatherwood LLP, by Maureen Demarest Murray, Terrill Johnson Harris, and Allyson Jones Labban, for Mission Hospitals, Inc., WakeMed, and The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Moses Cone Health System, amici curiae.*

*Kirschbaum, Nanney, Keenan & Griffin, P.A., by Frank S. Kirschbaum and Chad Lorenz Halliday, for Asheville Radiology Associates, P.A. and Surgical Care Affiliates, L.L.C., amici curiae.*

MARTIN, Chief Judge.

The 2008 State Medical Facilities Plan ("the 2008 Plan") was developed by the North Carolina Department of Health and Human Services, Division of Health Service Regulation ("the Department"), under the direction of the North Carolina State Health Coordinating Council ("the Council"). The Council's proposed 2008 Plan was made available to the public for review in the summer of 2007. During this review period, the Council conducted six public hearings and accepted petitions requesting changes to the proposed 2008 Plan.

On 3 August 2007, Hope—A Women's Cancer Center, P.A. ("plaintiff Center") filed a petition with the Council. In its petition, plaintiff Center requested the Council to adjust the need determination for dedicated breast MRI scanners to reflect a need for one in Health Service Area I. In support of its request, plaintiff Center argued that the need for a dedicated breast MRI scanner in this service area was great and that it, "with its clinical research program dedicated to the advancement of women's cancer care through clinical research and education" was the "ideal location for [this] . . . technology." On 31 August 2007, Raleigh Orthopaedic Clinic, P.A. ("plaintiff Raleigh Orthopaedic"), an orthopedic practice in Wake County, filed a petition requesting that the Council include in the 2008 Plan a need determination for six dedicated orthopedic ambulatory operating rooms in Wake County. After considering all petitions and making any necessary adjustments, the Council submitted the 2008 Plan to Governor Michael F. Easley ("Governor Easley") on 7 November 2007. The adjustments requested by plaintiffs were not included in the 2008 Plan.

Plaintiff Raleigh Orthopaedic subsequently petitioned Governor Easley to adjust the 2008 Plan to reflect a need for six dedicated orthopedic ambulatory operating rooms in Wake County. On 18 December 2007, Governor Easley approved the 2008 plan, making it effective 1 January 2008. In this finalized plan, there was no need determination for a dedicated breast MRI scanner in Health Service Area I, and the need determination for orthopedic ambulatory operating rooms in Wake County was set at four.

Plaintiff Center subsequently requested the Department to issue a declaratory ruling that its acquisition of a linear accelerator, a dual use position emission tomography scanner, and a magnetic resonance imaging scanner did "not constitute a new institutional health service . . . and that [plaintiff Center was] not required to obtain a CON for the described transaction." On 16 January 2008, Robert J. Fitzgerald, Director of the Department, denied plaintiff Center's request, stating that "the proposed transaction . . . would be a violation of the CON law if consummated in the manner described." On 8 February 2008, plaintiff Center sought judicial review of the Department's ruling in the Superior Court of Wake County. The trial court affirmed the Department's ruling on 26 June 2008.

Plaintiff Center and plaintiff Raleigh Orthopaedic ("plaintiffs") filed a complaint, and subsequently an amended complaint, against defendants seeking a declaratory judgment that provisions of the Certificate of Need Law ("CON law"), as applied to plaintiffs, constitute an unconstitutional delegation of legislative authority, violate plaintiffs' procedural and substantive due process rights, and deprive plaintiffs of meaningful access to the courts. Plaintiffs also sought monetary and injunctive relief. After defendants filed an answer denying plaintiffs' constitutional claims and a motion to dismiss the complaint pursuant to Rule 12(b)(1) and (6) of the North Carolina Rules of Civil Procedure, all parties made cross motions for judgment on the pleadings.

While this litigation was still on-going, Orthopaedic Surgery Center of Raleigh, LLC, a related entity of plaintiff Raleigh Orthopaedic, applied for a Certificate of Need ("CON") to construct a "freestanding ambulatory surgical facility with four surgical operating rooms in Wake County." By letter dated 28 January 2009, the Department's Certificate of Need Section granted Orthopaedic Surgery Center of Raleigh, LLC conditional approval to construct the requested facility.

On 26 March 2009, the trial court granted defendants' motion for judgment on the pleadings while denying plaintiffs' motion. In doing so, the trial court concluded that "[t]he SMFP, CON process and CON law, as applied, **do not violate** any of [p]laintiff[s'] constitutional rights." Plaintiffs appeal.

---

This Court reviews a denial of a motion for judgment on the pleadings *de novo*. *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335, *disc. review denied*, 360 N.C. 78, 623

S.E.2d 263 (2005). In conducting such a review, we are "limited to the facts properly pleaded in the pleadings before [us], inferences reasonably to be drawn from such facts and matters of which [we] may take judicial notice." *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 206, 171 S.E.2d 873, 878-79 (1970).

[1] Plaintiffs first contend the trial court erred because the CON law, as applied, delegates legislative authority to the Council in violation of Article I, Section 6 and Article II, Section 1 of the North Carolina Constitution. We disagree.

We first note plaintiffs' error in their assertion that the General Assembly has delegated legislative authority to the Council. The General Assembly has specifically recognized the role of the Council in *preparing* the Plan. *See* N.C. Gen. Stat. § 131E-176(25) (2009) (The Plan "means the plan prepared by the Department . . . and the . . . Council."). However, as our Supreme Court noted in *Frye Regional Medical Center, Inc. v. Hunt*, 350 N.C. 39, 510 S.E.2d 159, *reh'g denied*, 350 N.C. 314, 534 S.E.2d 590 (1999), the Council's role is strictly advisory. 350 N.C. at 44, 510 S.E.2d at 163. Instead, it is the Governor who "make[s] the final decision concerning the [Plan]'s contents after it has been developed and prepared by the Department and the Council." *Id.* Although the Council formulates a proposed Plan each year, its need determinations are ultimately approved by the Governor, and it is the Governor's role to "ensure that the [Plan] comports with the general health policies and goals of the state." *Id.* at 43, 510 S.E.2d. at 162. It is only after the Plan is approved by the Governor that the need determinations contained therein become determinative limitations on the ability of applicants to obtain CONs. *See* N.C. Gen. Stat. § 131E-183(a)(1) (2009) ("The proposed project shall be consistent with applicable policies and need determinations in the [Plan], the need determination of which constitutes a determinative limitation on the provision of any health service, health service facility, health service facility beds, dialysis stations, operating rooms, or home health offices that may be approved."). Despite plaintiffs' error, we find the General Assembly's delegation proper.

Article I, Section 6 of the North Carolina Constitution provides that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. Article II, Section 1 of the North Carolina Constitution vests the legislative authority in the General Assembly. N.C. Const. art. II, § 1. Though these provisions, taken together, literally preclude "the legislature [from] abdicat[ing] its

power to make laws or delegat[ing] its *supreme* legislative power to any coordinate branch or to any agency which it may create[,]" courts have consistently recognized that "[a] modern legislature must be able to delegate—in proper instances—a *limited* portion of its legislative powers to administrative bodies which are equipped to adapt legislation to complex conditions involving numerous details with which the Legislature cannot deal directly." *Adams v. North Carolina Dep't of Natural & Econ. Res.*, 295 N.C. 683, 696-97, 249 S.E.2d 402, 410 (1978) (internal quotation marks omitted). This is because "the problems which a modern legislature must confront are of such complexity that strict adherence to ideal notions of the non-delegation doctrine would unduly hamper the General Assembly in the exercise of its constitutionally vested powers." *Id.* Thus, a delegation of legislative authority is proper "provided such transfers are accompanied by adequate guiding standards to govern the exercise of the delegated powers." *Id.* at 697, 249 S.E.2d at 410. Moreover, "the presence or absence of procedural safeguards is relevant to the broader question of whether a delegation of authority is accompanied by adequate guiding standards." *Id.* at 698, 249 S.E.2d. at 411.

Our Supreme Court has stated that, "[i]n the search for adequate guiding standards the primary sources of legislative guidance are declarations by the General Assembly of the legislative goals and policies which an agency is to apply when exercising its delegated powers." *Id.* at 698, 249 S.E.2d at 411. However, "[d]etailed standards are not required . . . ." *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 300 N.C. 381, 402, 269 S.E.2d 547, 563, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 300 (1980). Instead, "[t]he modern tendency is to be more liberal in permitting grants of discretion to administrative agencies . . . ." *Id.*; *see also Adams*, 295 N.C. at 698, 249 S.E.2d at 411 ("When there is an obvious need for expertise in the achievement of legislative goals the General Assembly is not required to lay down a detailed agenda covering every conceivable problem which might arise in the implementation of the legislation."). Thus, "[i]t is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances." *Id.*

The General Assembly has made clear the policies underlying the enactment of the CON law. Specifically, the General Assembly found:

(1) That the financing of health care, particularly the reimbursement of health services rendered by health service facilities, lim-

its the effect of free market competition and government regulation is therefore necessary to control costs, utilization, and distribution of new health service facilities and the bed complements of these health service facilities.

(2) That the increasing cost of health care services offered through health service facilities threatens the health and welfare of the citizens of this State in that citizens need assurance of economical and readily available health care.

(3) That, if left to the market place to allocate health service facilities and health care services, geographical maldistribution of these facilities and services would occur and, further, less than equal access to all population groups, especially those that have traditionally been medically underserved, would result.

(3a) That access to health care services and health care facilities is critical to the welfare of rural North Carolinians, and to the continued viability of rural communities, and that the needs of rural North Carolinians should be considered in the certificate of need review process.

(4) That the proliferation of unnecessary health service facilities results in costly duplication and underuse of facilities, with the availability of excess capacity leading to unnecessary use of expensive resources and overutilization of health care services.

. . . .

(6) That excess capacity of health service facilities places an enormous economic burden on the public who pay for the construction and operation of these facilities as patients, health insurance subscribers, health plan contributors, and taxpayers.

(7) That the general welfare and protection of lives, health, and property of the people of this State require that new institutional health services to be offered within this State be subject to review and evaluation as to need, cost of service, accessibility to services, quality of care, feasibility, and other criteria as determined by provisions of this Article or by the North Carolina Department of Health and Human Services pursuant to provisions of this Article prior to such services being offered or developed in order that only appropriate and needed institutional health services are made available in the area to be served.

N.C. Gen. Stat. § 131E-175(1)-(4), (6)-(7) (2009). Additionally, the General Assembly has set forth detailed guidelines as to which services are encompassed by the CON law, and thus the Plan, as well as which services are exempt. N.C. Gen. Stat. §§ 131E-176(16), -178(a), -184 (2009). The Council and the Governor are guided by these principles and guidelines in their creation and approval of the Plan, and specifically the 2008 Plan. *See* N.C. Gen. Stat. § 131E-175(7) (stating that certain criteria—i.e. the Plan—from which new institutional health services will be evaluated are determined by the Department "pursuant to provisions of this Article"); *see also Frye*, 350 N.C. at 43, 510 S.E.2d at 162 ("[T]he Governor must, as a part of the approval process, ensure that the [Plan] comports with the general health policies and goals of the state."). Due to the complexity involved in determining the evolving need for various health services and medical equipment in the State, we conclude these standards "are as specific as the circumstances permit," and thus sufficient. *N.C. Tpk. Auth. v. Pine Island, Inc.*, 265 N.C. 109, 115, 143 S.E.2d 319, 323 (1965); *see also Adams*, 295 N.C. at 699-700, 249 S.E.2d at 412 (noting that the General Assembly's general list of goals for the coastal area management system constituted sufficiently specific guidelines in light of the expertise required to "develop[] and adopt[] detailed land use guidelines for the complex ecosystem of the coastal area").

In addition to these guidelines, the General Assembly has also provided an adequate system of procedural safeguards. Before it is submitted to the Governor, the Plan is prepared each year by the Council and the Department. N.C. Gen. Stat. § 131E-176(25). During its creation, there are a total of at least seven required public hearings, one before and six after the Council adopts the Plan. *Id.* Fifteen days before a scheduled hearing, the Department must notify the people "who have requested notice of public hearings regarding the Plan." *Id.* Additionally, the Council must accept both written and oral comments on the Plan before submitting it to the Governor for approval. *Id.* If these procedures are not followed, the Plan will be subject to the Administrative Procedure Act ("APA"), which "establishes a uniform system of administrative rule making and adjudicatory procedures for agencies." N.C. Gen. Stat. § 150B-1(a) (2009); N.C. Gen. Stat. § 150B-2(8a)k (2009) (exempting the Plan from the definition of "rule" only "if the Plan has been prepared with public notice and hearing as provided in G.S. 131E-176(25), reviewed by the Commission for compliance with G.S. 131E-176(25), and approved by the Governor"). These procedural safeguards are adequate to ensure that the Plan will be created "in a manner consistent with [the] leg-

islative intent." *Adams*, 295 N.C. at 701, 249 S.E.2d at 412; *see also Town of Spruce Pine v. Avery Cty.*, 346 N.C. 787, 793, 488 S.E.2d. 144, 147-48 (1997) (finding the North Carolina Environmental Management Commission was subjected to sufficient procedural safeguards in creating rules and regulations where the agency was advised multiple times by a council comprised of representatives from various backgrounds before adopting the rule, was required to conduct multiple public hearings before adoption of the rule, and was required to submit reports to a legislative commission).

Plaintiffs, however, argue that there are no procedural safeguards in place because the Plan is exempt from the rule making procedures of the APA and the Council is exempt from the provisions of the State Government Ethics Act ("Ethics Act"). We believe the procedural safeguards established by N.C.G.S. § 131E-176(25) are sufficient, especially in light of the fact that these standards are similar to the ones for rule making required by the APA. *See* N.C. Gen. Stat. § 150B-21.2(a)(1)-(5) (2009) (requiring an agency to provide notice of a proposed rule, have a public hearing on a proposed rule, and accept oral or written comments on the proposed rule before the rule can be adopted). It is not required that the Plan must be subject to the same exact standards set forth in the APA in order to be constitutionally sufficient. Additionally, as stated above, the General Assembly has delegated the authority to ultimately finalize the Plan to the Governor, who is in fact subject to the Ethics Act. N.C. Gen. Stat. § 138A-3(30)a (2009) (defining public servants as "[c]onstitutional officers of the State and individuals elected or appointed as constitutional officers of the State prior to taking office"); N.C. Gen. Stat. 138A-3(10) (2009) (defining a "covered person" under the Ethics Act as "[a] legislator, public servant, or judicial officer, as identified by the Commission under G.S. 138A-11"). Moreover, we do not see how exclusion of the Council from the Ethics Act, which was created years after the CON law was enacted, constitutionally invalidates the Plan. *See* 2006 N.C. Sess. Laws 747, 799, ch. 201, § 25 (making the Ethics Act effective 1 October 2006); *see also* 1977 N.C. Sess. Laws (2d Sess.1978) 71, 84, ch. 1182, § 4 (making Article 18 of Chapter 131 of the North Carolina General Statutes effective 1 January 1979). Accordingly, because the General Assembly has set forth sufficient guiding standards and procedural safeguards to follow in creating the Plan, we find its delegation of this legislative authority proper.

Plaintiffs, in urging a different result, finally suggest that the General Assembly's delegation of authority to the Council to create

the Plan is a facially invalid delegation to private individuals. Specifically, plaintiffs suggest that "[t]he affiliation of members of the Council with existing healthcare providers, and the Council's exemption from the protections contained in the Ethics Act, make any need determinations made by the Council inherently subject to abuse." Again, we reiterate that the Council serves in merely an advisory capacity to the Governor, in whom is reposed the final decision as to the contents of the Plan. Additionally, the affiliation of some of the Council members with existing medical facilities throughout the state automatically is not a sufficient interest to render their decisions subject to abuse. *See City of Albemarle v. Sec. Bank & Tr. Co.*, 106 N.C. App. 75, 77-79, 415 S.E.2d 96, 98-99 (1992) (affirming the trial court's finding that "the interest of the respective council members[, who were executives in financial institutions in direct competition with the defendant,] . . . was too remote and infinitesimal to give rise to a conflict of interest" (internal quotation marks omitted)). Thus, the General Assembly has not unconstitutionally delegated its legislative authority.

**[2]** Plaintiffs next argue that their rights to due process of law, guaranteed by Article I, Section 1 and Section 19 of the North Carolina Constitution, are denied by the CON law. Specifically, they argue that because the CON law requires "a provider to obtain a CON before developing a new institutional health service" while also imposing "a Plan that ensures that the provider's CON application will be rejected," they are denied the right to engage in business without due process of law.

Plaintiffs first appear to suggest that the CON law violates their procedural due process rights. However, they have provided no legal authority or argument in support of this contention, and we therefore decline to consider it. N.C.R. App. P. 28(b)(6) (amended Oct. 1, 2009) (deeming abandoned any assignments of error for which "no reason or argument is stated or authority cited").

Plaintiffs' substantive due process argument rests on the constitutional guarantees set forth in Article I, Section 1 and Section 19 of the North Carolina Constitution. Article I, Section 1 establishes that all persons are afforded the "inalienable rights [of] . . . life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1. Article I, Section 19 provides, "[n]o person shall be . . . deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. "The law of the land, like due process of law, serves to limit the state's police power to actions

which have a real or substantial relation to the public health, morals, order, safety or general welfare." *Poor Richard's Inc., v. Stone*, 322 N.C. 61, 64, 366 S.E.2d 697, 699 (1988) (internal quotation marks omitted). "These constitutional protections have been consistently interpreted to permit the state, through the exercise of its police power, to regulate economic enterprises provided the regulation is rationally related to a proper governmental purpose." *Id.* Since obtaining a dedicated breast MRI scanner and constructing six dedicated orthopedic ambulatory operating rooms are economic enterprises, we must determine (1) whether there exists a legitimate governmental purpose for the creation of the CON law and (2) whether the means undertaken in the CON law are reasonable in relation to this purpose. *Id.*; *see also Affordable Care, Inc. v. N.C. State Bd. of Dental Exam'rs*, 153 N.C. App. 527, 536-37, 571 S.E.2d 52, 59-60 (2002) (reiterating that "economic rules and regulations do not affect a fundamental right for purposes of due process" and thus only require a rational relation standard instead of a strict scrutiny analysis); *see also In re Certificate of Need for Aston Park Hosp., Inc.*, 282 N.C. 542, 551, 193 S.E.2d 729, 735 (1973) (applying a reasonable relation standard in determining whether the previous CON law violated the plaintiff's substantive due process rights where the plaintiff was denied a CON to build a hospital). In making this determination, it has been said "that the relationship need not be a perfect one, but that the legislature need only have had a reasonable basis for concluding that the measures taken would assist in the accomplishment of the goal." *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n*, 336 N.C. 657, 682, 446 S.E.2d 332, 346 (1994).

The ultimate purpose in enacting the CON law was to protect the health and welfare of North Carolina citizens by providing affordable access to necessary health care. N.C. Gen. Stat. § 131E-175(7) ("[T]he general welfare and protection of lives, health, and property of the people of this State require that new institutional health services to be offered within this State be subject to review and evaluation as to need, cost of service, accessibility to services, quality of care, feasibility, and other criteria."). This purpose is a legitimate one. *See Affordable Care, Inc.*, 153 N.C. App. at 537, 571 S.E.2d at 60 (finding that "the Rule's purpose . . . to protect the public health and welfare with respect to the practice of dentistry" was a legitimate governmental purpose).

In order to achieve this goal, the General Assembly set forth requirements that must be met before a new institutional health serv-

ice can be offered or developed. N.C. Gen. Stat. § 131E-183(a). One such requirement is that the new institutional health service comply with the need determinations established in the Plan. N.C. Gen. Stat. § 131E-183(a)(1). The General Assembly determined that this "need" requirement was necessary before allowing a new institutional health service to be created because (1) the effects of free market competition are limited in the field of health care, requiring governmental regulation "to control costs, utilization, and distribution of new health service facilities[;]" (2) citizens's health and welfare is enhanced by "assurance of economical and readily available health care[,]" which is threatened by increasing costs in the health care field; (3) "geographical maldistribution" of health care services and facilities, and thus unequal access to health care, would occur if the allocation of these services was left to the market place; (4) access to health care is critical to the welfare of North Carolina citizens; and (5) the creation of "unnecessary health service facilities results in costly duplication and underuse of facilities," which "places an enormous economic burden on the public." N.C. Gen. Stat. 131E-175(1)-(4), (6)-(7). Thus, the General Assembly determined that approving the creation or use of new institutional health care services based in part on the need of such service was necessary in order to ensure that all citizens throughout the State had equal access to health care services at a reasonable price, a situation that would not occur if such regulation were not in place.

The process by which the General Assembly chose to make need determinations was through the annual development of the Plan. The Plan is created each year under the guidance of the Council. The members of the Council, which include members from academic medical centers, health education centers, the health industry, the health insurance industry, various State health care associations, the North Carolina Medical Society, the North Carolina Association of County Commissioners, the United States Department of Veterans Affairs, the North Carolina House of Representatives, and the North Carolina Senate, are appointed by the Governor. Through the use of detailed methodologies, the Council determines the need for each institutional health service in each designated area. In developing the Plan, the Council conducts public hearings and accepts oral and written comments on its contents. See N.C. Gen. Stat. § 131E-176(25). Once the Council has completed its recommended Plan, the Governor approves the final version after making any substantive changes deemed appropriate. See id. At this point, the need determinations

set forth in the Plan are utilized by the Department in evaluating CON applications. N.C. Gen. Stat. § 131E-183(a)(1).

The General Assembly's desire to ensure that citizens have affordable access to necessary health care is a legitimate goal, and it is a reasonable belief that this goal would be achieved by allowing approval of new institutional health services only when a need for such services had been determined. *See Armstrong v. N.C. State Bd. of Dental Exam'rs*, 129 N.C. App. 153, 161-62, 499 S.E.2d 462, 469 (finding the statute rationally related to a legitimate purpose where "the legislature could have reasonably believed that the statute would promote these ends"), *appeal dismissed, disc. review denied, disc. review dismissed as moot*, 348 N.C. 692, 511 S.E.2d 643 (1998), *cert. denied*, 525 U.S. 1103, 142 L. Ed. 2d 770 (1999). The current CON law was enacted pursuant to the National Health Planning and Resource Development Act of 1974 ("National Health Act"), which required "states to establish certificate of need programs as a prerequisite to obtaining federal health program financial grants." *Total Renal Care of North Carolina LLC v. N.C. Dep't of Health & Human Servs.*, —— N.C. App. ——, ——, 673 S.E.2d 137, 139 (2009). The National Health Act was passed in order to address the concern of the United States Congress "that the many *unneeded* hospital beds available in the nation imposed an unnecessarily exorbitant financial burden on the furnishing of required health care, and that there was an uneven distribution of health care facilities, resulting in some areas being over supplied and others being woefully deficient." *State of North Carolina ex rel. Morrow v. Califano*, 445 F. Supp. 532, 534 (1977), *aff'd*, 435 U.S. 962, 56 L. Ed. 2d 54 (1978) (emphasis added). Thus, following Congress's logic, the General Assembly acted reasonably in concluding that citizens would have equal access to health care in facilities that did not economically overburden the public if new institutional health services were allowed only in areas where they were clearly needed. *See id.*; *see also Total Renal Care of North Carolina LLC*, —— N.C. App. at ——, 673 S.E.2d at 139 ("The fundamental purpose of the CON Law is to limit the construction of health care facilities in North Carolina to those that are needed by the public and that can be operated efficiently and economically for the public's benefit.").

Moreover, utilization of the Plan to determine which institutional health services are needed is appropriate. The Council, which is comprised of individuals knowledgeable in the provision of health care services, makes the need determinations on an annual basis, ensuring

that the need determinations are accurate and up-to-date. *See* N.C. Gen. Stat. § 131E-176(25). Citizens, including plaintiffs, are afforded the opportunity to provide input with respect to the necessity of various health care services in the formation of the annual Plan. *Id.* Once the Plan is adopted, the Department, which is afforded limited time to evaluate CON applications, is provided with the Plan's need determinations for utilization in its review instead of having to research such determinations on its own. *See* N.C. Gen. Stat. § 131E-185(a1) (2009) (providing "a time limit of 90 days for review of [CON] applications"); *see also* N.C. Gen. Stat. § 131E-183(a)(1) (establishing that the first criteria which the Department is to use in evaluating CON applications is their compliance with the need determinations provided in the Plan). This procedure is efficient and effective and we do not believe, as plaintiffs suggest, that a case by case determination of need, beyond that determined by the Plan, is required to provide an applicant with due process. Because the CON law, and the need determination process contained therein, are reasonably related to the General Assembly's goal of protecting the public welfare by ensuring that all citizens have access to reasonably affordable health care, we find plaintiffs' due process rights are not violated.

Relying on *In re Certificate of Need for Aston Park Hospital, Inc., supra,* plaintiffs urge a different result. In that case, our Supreme Court invalidated the predecessor to the current CON law on the basis that it violated the plaintiff's substantive due process rights. *Aston Park,* 282 N.C. at 551, 193 S.E.2d at 735. The prior law prohibited the issuance of a certificate of need unless it was "necessary to provide new or additional inpatient facilities in the area to be served." *Id.* at 545, 193 S.E.2d at 732 (internal quotation marks omitted). However, there were limited findings made by the General Assembly as to how this requirement promoted the public welfare. *See id.* at 544, 193 S.E.2d at 731 (noting that the previous CON law simply required the licensing agencies to "make a 'determination of need'" before issuing a license to provide new health facilities in order to "encourage the necessary and adequate development of health and medical care facilities . . . in a manner which is orderly, timely, economical, and without unnecessary duplication of these facilities"). Thus, the Court held that no "reasonable relation between the denial of the right of a person, association or corporation to construct and operate upon his or its own property, with his or its own funds, an adequately staffed and equipped hospital and the promotion of the public health" existed. *Id.* at 551, 193 S.E.2d at 735. In doing so, the Court stressed that there was no evidence to suggest market

forces and competition would not "lower prices, [and create] better service and more efficient management" in the health services arena. *Id.* at 549, 193 S.E.2d at 734.

The current CON law is distinguishable from the one invalidated in *Aston Park.* Most significantly, the current law contains detailed explanations as to how the requirement of a CON based on need determinations promotes the public welfare. *See* N.C. Gen. Stat. § 131E-175(1)-(4), (6)-(7). Within these findings, the General Assembly has specifically emphasized that "if left to the market place to allocate health service facilities and health care services, geographical maldistribution of these facilities and services would occur." N.C. Gen. Stat. § 131E-175(3). Thus, the deficiencies identified by the Court in *Aston Park* are no longer present in the current CON law. *See HCA Crossroads Residential Ctrs., Inc. v. N.C. Dep't of Human Res.,* 327 N.C. 573, 584, 398 S.E.2d 466, 473 (Whichard, J., dissenting on other grounds) ("Since *Aston Park,* the General Assembly has re-enacted the CON law and made the explicit findings discussed above which describe the relation between the purposes behind the CON law and the effect it has on individual property rights. Thus, the constitutional infirmity identified in *Aston Park* is not at issue here."). Therefore, as this Court has already noted, the holding in *Aston Park* is moot, and plaintiffs' reliance thereon is misplaced. *State ex rel. Utils. Comm'n v. Empire Power Co.,* 112 N.C. App. 265, 275, 435 S.E.2d 553, 558 (1993), *disc. review denied,* 335 N.C. 564, 441 S.E.2d 125 (1994).

**[3]** Finally, plaintiffs attempt to argue that the CON Law, in connection with the Administrative Procedures Act, N.C.G.S. § 150B-34(c) ("APA"), and the North Carolina Administrative Code provision 10A N.C.A.C. 14C.0402, deny their right of access to the courts in violation of Article I, Section 18 of the North Carolina Constitution. However, plaintiffs have not established that they have standing to bring this challenge. "Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy such that he or she may properly seek adjudication of the matter." *Prop. Rights Advocacy Grp. v. Town of Long Beach,* 173 N.C. App. 180, 182, 617 S.E.2d 715, 717 (internal quotation marks omitted), *as to additional issues appeal dismissed and disc. review denied,* 360 N.C. 177, 626 S.E.2d 649 (2005), *aff'd per curiam,* 360 N.C. 474, 628 S.E.2d 768 (2006). "Standing to challenge the constitutionality of a legislative enactment exists where the litigant has suffered, or is likely to suffer, a direct injury as a result of the law's enforcement." *Maines v. City of*

*Greensboro*, 300 N.C. 126, 130-31, 265 S.E.2d 155, 158 (1980). Similarly, when a party challenges a statute's constitutionality on an as applied basis, they must allege facts as to "how a statute was applied in the particular context in which plaintiff acted or proposed to act." *Frye v. City of Kannapolis*, 109 F. Supp. 2d 436, 439 (M.D.N.C. 1999).

Citing only Article I, Section 18 of the North Carolina Constitution, plaintiffs allege that "[t]he CON Law, the APA, and the provisions of 10A N.C.A.C. 14C.0402, as applied in this case, combine to deprive [them] of access to the courts for redress of grievances . . . ." In support of this argument, plaintiffs contend that the exemption of CON decisions from certain provisions of the APA, which provide for review of agency decisions, denies them "effective judicial review of CON decisions." However, as plaintiffs acknowledge, "[a]fter a decision of the Department to issue, deny or withdraw a certificate of need . . . any affected person . . . shall be entitled to a contested case hearing." N.C. Gen. Stat. § 131E-188(a) (2009). Thus, it appears that plaintiffs are essentially arguing that the procedures which the General Assembly has provided for review of CON decisions are inadequate.

However, plaintiffs have not alleged, and there is no evidence in the record to show, that they actually sought relief or intended to seek relief under the review procedures they challenge. The record indicates that plaintiff Raleigh Orthopaedic did in fact submit an application for a CON requesting permission to construct a "freestanding ambulatory surgical facility with four surgical operating rooms" instead of the six operating rooms it desired. There is no evidence that plaintiff Center applied for a CON. Moreover, there is no evidence that either plaintiff was subsequently denied a requested CON or filed a petition for a contested case hearing. Thus, plaintiffs have not shown how these statutes were "applied in the particular context in which plaintiff[s] acted or proposed to act." *Frye*, 109 F. Supp. 2d at 439. Because of this, plaintiffs have not established standing to challenge these statutes. *See In re Perkins*, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983) (finding the respondent had no standing to challenge the constitutionality of the statutes when he had failed "to show that he ha[d] been adversely affected by the . . . statutes as applied").

Assuming plaintiffs had standing to challenge the constitutionality of these provisions, their claim that they have been denied access to the courts is without merit. Currently, any party who is denied a CON is entitled to a contested case hearing where an administrative

law judge reviews the CON decision and issues a recommended decision containing findings of fact and conclusions of law. N.C. Gen. Stat. § 131E-188(a); N.C. Gen. Stat. § 150B-34(c) (2009). The Department then reviews the administrative law judge's decision, addressing all facts contained therein. N.C. Gen. Stat. § 150B-34(c). If the Department declines to adopt a finding made by the administrative law judge, it must state its specific reasons. *Id.* The Department then makes a final decision based on its findings of fact, which must be supported by substantial evidence. *Id.* Any party dissatisfied with the Department's final decision is entitled to appeal the decision to this Court. N.C. Gen. Stat. § 131E-188(b) (2009).

However, plaintiffs contend that a meaningful review is only possible if CON decisions are subject to certain provisions of the APA. Because the General Assembly has specifically exempted review of CON decisions from these provisions, plaintiffs attempt to argue their constitutional rights of access to the courts have been violated. *See* N.C. Gen. Stat. § 150B-34(c) ("The provisions of G.S. 150B-36(b), (b1), (b2), (b3), and (d), and G.S. 150B-51 do not apply to cases" "arising under Article 9 of Chapter 131E of the General Statutes."). Moreover, plaintiffs suggest, without providing any argument or legal support, that because "[t]he correctness, adequacy, or appropriateness of criteria, plans, and standards shall not be an issue in a contested case hearing[,]" N.C. Admin. Code tit. 10A, r. 14C.0402 (June 2008), they are prevented from effectively challenging the "determinative issue in a contested case."

The North Carolina Constitution guarantees an aggrieved party access to the courts in order to obtain a remedy. N.C. Const. art. I, § 18. However, "the remedy constitutionally guaranteed must be one that is legally cognizable. The legislature has the power to define the circumstances under which a remedy is legally cognizable and those under which it is not." *Lamb v. Wedgewood S. Corp.*, 308 N.C. 419, 444, 302 S.E.2d 868, 882 (1983). Thus, this Court has held that "[t]here is no constitutional or inalienable right of appellate or judicial review of an administrative decision," and "[t]here can be no appeal from [such] decision . . . except pursuant to [a] specific statutory provision . . . ." *In re Vandiford*, 56 N.C. App. 224, 227, 287 S.E.2d 912, 914 (1982). Since a CON decision is an administrative decision, plaintiffs are not constitutionally entitled to any judicial review or appeal. The General Assembly has set forth the process for review of CON decisions which it deems appropriate. This is the only process to which plaintiffs are entitled; they are not, as they suggest, entitled to the

judicial review of their choice. Accordingly, plaintiffs' constitutional right of access to the courts has not been violated.

Affirmed.

Judges STEPHENS and ERVIN concur.