RIGGINGS HOMEOWNERS, INC. v. COASTAL RES. COMM'N OF N.C.

[228 N.C. App. 630 (2013)]

### III.  Conclusion

Thus, for the reasons set forth above, we hold that the trial court correctly determined that Plaintiff was unlikely to prevail in its attempt to obtain enforcement of the non-competition agreement contained in the franchise agreement. As a result, the trial court's order should be, and hereby is, affirmed.

AFFIRMED.

Judges BRYANT and ELMORE concur.

_____

RIGGINGS HOMEOWNERS, INC., Petitioner
v.
COASTAL RESOURCES COMMISSION OF THE STATE
OF NORTH CAROLINA, Respondent

No. COA12-1299

Filed 6 August 2013

1. **Environmental Law—beach erosion—stability statement—mutual misunderstanding**

    The trial court did not err in a beach erosion case by holding the Coastal Resources Commission's statement that "erosion is stable" was prejudicial error. Any disagreement arose from mutual misunderstanding rather than disputed legal principles.

2. **Environmental Law—beach erosion—variance factors—improper reliance on property owner rather than property**

    The trial court did not err in a beach erosion case by holding the Coastal Resources Commission improperly based its first variance factor determination on the property owner rather than the property.

3. **Environmental Law—beach erosion—variance factors—hardships—unnecessary hardships**

    Any error based on the trial court's determination in a beach erosion case that "it is not possible to have hardships [under the

RIGGINGS HOMEOWNERS, INC. v. COASTAL RES. COMM'N OF N.C.

[228 N.C. App. 630 (2013)]

second and third variance factors] but not unnecessary hardships [under the first variance factor]" was non-prejudicial.

4. **Environmental Law—beach erosion—variance factors— private property interest outweighed public interests**

The trial court did not err in a beach erosion case by reversing the Commission's fourth variance factor determination in result. The Riggings' private property interest outweighed the public interests considered by the Commission.

5. **Environmental Law—beach erosion—reasonable use of property—no factual findings required**

The trial court did not err in a beach erosion case by deciding the Commission did not need to make factual findings regarding the reasonable use of the property.

6. **Appeal and Error—appealability—ripeness**

Although petitioner contended the Coastal Resource Commission's denial of its variance request constituted an impermissible taking, this issue was not ripe for review because there had not yet been a final variance decision.

7. **Constitutional Law—separation of powers—constitutional delegation of legislative powers to administrative agency**

The Coastal Resource Commission did not violate the separation of powers doctrine in a beach erosion case by allegedly acting in a quasi-legislative and quasi-judicial capacity. The Commission's creation under the Coastal Area Management Act was a constitutional delegation of legislative power. Further, since N.C.G.S. § 113A-120.1(a) explicitly contemplated the Commission's issuance of variances, judicial authority to rule on variance requests was "reasonably necessary" to accomplish the Commission's statutory purpose.

Judge BRYANT concurring in part and dissenting in part in separate opinion.

Appeal by respondent and cross-appeal by petitioner from order entered 1 June 2012 by Judge Jay D. Hockenbury in New Hanover County Superior Court. Heard in the Court of Appeals 10 April 2013.

*Shipman & Wright, L.L.P., by William G. Wright and Gary K. Shipman, for petitioner-appellee/cross-appellant.*

*Attorney General Roy Cooper, by Assistant Attorney General Christine A. Goebel and Special Deputy Attorney General Marc Bernstein, for respondent-appellant/cross-appellee.*

HUNTER, JR., Robert N., Judge.

The North Carolina Coastal Resources Commission (the "Commission") appeals a trial court order: (i) reversing the Commission's denial of a variance request; and (ii) remanding the case to the Commission for new hearing. Riggings Homeowners, Inc. cross-appeals, alleging: (i) the trial court erred in concluding the Commission did not need to make a "reasonable use" determination; (ii) the Commission's variance denial violated the takings doctrine; and (iii) the Commission's variance denial violated the separation of powers doctrine. Upon review, we affirm.

## I. Facts & Procedural History

Riggings Homeowners, Inc. ("The Riggings") manages a homeowners' association (a North Carolina non-profit corporation) in Kure Beach. The Riggings operates forty-eight condo units located in four buildings facing the Atlantic Ocean. The condos were built in 1985.

Immediately south of The Riggings is Fort Fisher, a North Carolina state park. From July 1995 to January 1996, the State built a permanent stone revetment to protect Fort Fisher from erosion. Although the Coastal Area Management Act ("CAMA") generally does not allow permanent revetments, the Commission allowed this revetment[1] under the historic sites exception.

Immediately north of The Riggings is the Fort Fisher Coquina Outcrop Natural Area. Coquina rock formations provide a natural barrier against beach erosion. In 1926, the New Hanover County Board of County Commissioners allowed a government contractor to use the coquina rock to complete a section of U.S. Highway 421. The contractor removed a 50-100 foot strip of coquina rock near The Riggings. On 6 February 1982, the Fort Fisher Coquina Outcrop Natural Area was entered on the North Carolina Registry of Natural Heritage Areas.

These two state actions have made The Riggings' beachfront especially prone to erosion. First, the removal of the coquina rock in 1926

---

1. A "revetment" is "a facing of stone, concrete, fascines, or other material to sustain an embankment." *Webster's Third New International Dictionary* 1944 (1971). When used for coastal protection, revetments prevent sand erosion.

took away a natural barrier to erosion. Second, the construction of the stone revetment at Fort Fisher protected the beachfront there but at The Riggings' beachfront increased erosion rates. This combination of state action makes The Riggings' beachfront *sui generis*.

In 1985, Kure Beach's local CAMA officer issued a permit allowing The Riggings to place a sandbag revetment on its beachfront because the condos were "imminently threatened" by erosion.[2] On 3 December 1994, the Division of Coastal Management ("DCM")[3] issued CAMA General Permit No. 13355-D, authorizing repair of the 1985 sandbags and placement of new sandbags. Permit No. 13355-D allowed the sandbags to remain in place until 1 May 2000. After 1 May 2000, The Riggings was precluded from maintaining the sandbags without a variance.[4]

From 2000 to 2005, The Riggings applied for and received three variances to maintain the sandbags: (i) on 26 May 2000, the Commission granted a variance allowing the sandbags to remain in place until 26 May 2001; (ii) on 4 February 2002, the Commission granted another variance, allowing the sandbags to remain in place until 23 May 2003; (iii) on 9 May 2003, a new variance allowed the sandbags to remain in place until 9 May 2005. Meanwhile, The Riggings pursued several permanent erosion solutions.

One potential solution was beach renourishment. In 2000, the U.S. Army Corps of Engineers undertook the Carolina/Kure Beach Renourishment Project. This project covered 98% of Kure Beach, but stopped 1,500 feet short of The Riggings' beachfront. The Riggings was unsuccessful in efforts to convince the U.S. Army Corps of Engineers to extend the renourishment project to The Riggings' beachfront. In a 25 February 2000 letter to U.S. Representative Mike McIntyre, the U.S. Army Corps of Engineers explained that it could not extend the renourishment project to The Riggings' beachfront because the "[coquina] rock outcropping[s] [have] been declared a natural heritage area by the North Carolina Natural Heritage Program and burying them was not an acceptable alternative." A second Carolina/Kure Beach Renourishment Project in 2007 renourished 98% of Kure Beach, but again stopped 1,500 feet short of The Riggings' beachfront.

---

2. 15A N.C.A.C. 7H.0308(a)(2)(b) allows temporary erosion control structures when buildings are "imminently threated" by being less than 20 feet from an erosion scarp.

3. In 1992, the DCM took responsibility for the issuance of CAMA permits.

4. 15A N.C.A.C. 7H.1705(a)(14) only allows "imminently threatened" buildings to seek one permit.

Concurrently, The Riggings explored rebuilding its condos across the street on the landward side of U.S. Highway 421. The Riggings contacted the North Carolina Division of Emergency Management ("NCDEM"), the Natural Heritage Trust Fund, and the DCM for financial assistance with this venture. It requested that the Town of Kure Beach assist by seeking FEMA grants to relocate these buildings.

In July 2004, the Town of Kure Beach received a FEMA pre-disaster grant for a $3,617,624 project to: (i) acquire The Riggings' beachfront real estate; and (ii) rebuild The Riggings on the landward side of U.S. Highway 421. FEMA agreed to provide $2,713,218 (75% of the costs), but required The Riggings' homeowners to contribute the remaining $904,406 (25% of the costs). This grant, by its terms, would expire on 30 June 2007.

By March 2005, The Riggings had hired architects, surveyors, and other contractors to finalize plans to relocate the buildings to U.S. Highway 421's landward side. On 25 April 2005, the Commission granted The Riggings another variance to allow the sandbags to remain in place "until the FEMA grant expires in June, 2007." The variance order also stated, "Petitioner shall be responsible for removal of the sandbags prior to expiration of the FEMA grant."

The Riggings approached its homeowners to discuss funding the remaining $904,406 for the project. On 1 May 2006, the President of The Riggings' homeowners' association notified the Mayor of Kure Beach that The Riggings' homeowners voted to reject the FEMA grant. The homeowners cited several reasons for this decision: (i) some homeowners could not contribute the required capital; (ii) the grant did not guarantee that future permitted uses for the oceanfront real estate would not change; and (iii) the holders of some homeowners' mortgages did not consent to the project.

As a result, on 17 May 2006 the Mayor of Kure Beach requested that NCDEM terminate the FEMA grant. On 20 June 2006 a NCDEM officer notified the DCM that the FEMA grant was terminated. On 10 July 2006, a DCM district manager notified The Riggings that it had 30 days to remove the sandbags.

However, The Riggings did not comply. On 15 August 2006, the DCM sent The Riggings a Notice of Violation, requiring removal of all sandbags. On 18 September 2006, the DCM sent The Riggings a Notice of Continuing Violation.

Meanwhile, on 22 August 2006, The Riggings applied for a new variance under N.C. Gen. Stat. § 113A-120.1 and 15A N.C.A.C. 7J.0700 while it

pursued a new beach renourishment project (the "Habitat Enhancement Project"). The relevant statute states that:

> (a) Any person may petition the Commission for a variance granting permission to use the person's land in a manner otherwise prohibited by rules or standards prescribed by the Commission, or orders issued by the Commission, pursuant to this Article. To qualify for a variance, the petitioner must show all of the following:
>
> (1) Unnecessary hardships would result from strict application of the rules, standards, or orders.
>
> (2) The hardships result from conditions that are peculiar to the property, such as the location, size, or topography of the property.
>
> (3) The hardships did not result from actions taken by the petitioner.
>
> (4) The requested variance is consistent with the spirit, purpose, and intent of the rules, standards, or orders; will secure public safety and welfare; and will preserve substantial justice.

N.C. Gen. Stat. § 113A-120.1(a) (2011).

On 17 January 2008, the Commission heard the variance request. On 31 January 2008, the Commission entered an order denying the request because The Riggings did not prove: (i) that denial of a variance would result in "unreasonable hardship;" (ii) that any hardship "result[ed] from conditions peculiar to [its] property;" (iii) that any hardship was not the result of its actions; and (iv) that its request is "within the spirit, purpose, and intent of the Commission's rules."

On 7 March 2008, The Riggings timely filed a petition for judicial review in New Hanover County Superior Court. The trial court issued a writ of certiorari and heard the case during its 5 January 2009 Civil, Non-Jury Session. On 20 February 2009, the trial court: (i) reversed the Commission's denial of the variance; and (ii) remanded the case to the Commission to apply an "unnecessary hardships" standard instead of an "unreasonable hardship" standard.

On 29 April 2009, the Commission reheard the case. On 21 May 2009, it denied The Riggings' variance request under the "unnecessary hardships" standard. On 17 June 2009, The Riggings timely filed a petition for judicial review in New Hanover County Superior Court. The

trial court heard the case during its 12 March and 13 March 2012 Civil, Non-Jury Sessions.

On 1 June 2012, the trial court reversed the Commission's variance denial because it determined the Commission erred by: (i) concluding The Riggings did not demonstrate unnecessary hardship; and (ii) concluding the variance is not "consistent with the spirit, purpose, and intent of the rules." The trial court also determined: (i) the Commission did not need to make factual findings or legal conclusions as to the impact of the variance denial on The Riggings' ability to make reasonable use of its property; (ii) the Commission's actions did not violate the takings doctrine; and (iii) the Commission's actions did not violate the separation of powers doctrine.

On 27 June 2012, the Commission filed timely notice of appeal to this Court. On 29 June 2012, The Riggings filed timely notice of cross-appeal.

## II. Jurisdiction & Standard of Review

This Court has jurisdiction to hear the instant case pursuant to N.C. Gen. Stat. §7A-27(b) (2011) and N.C. Gen. Stat. § 150B-52 (2011).

The Administrative Procedure Act provides the standard of review for agency decisions:

> (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>
> (6) Arbitrary, capricious, or an abuse of discretion.
>
> (c) In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of

the final decision and the official record. With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the de novo standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.

N.C. Gen. Stat. § 150B-51 (2011). Overall, "[a]n appellate court's review proceeds in two steps: (1) examining whether the trial court applied the correct standard of review and (2) whether the trial court's review was proper." *City of Rockingham v. N.C. Dept. of Env't and Natural Res., Div. of Water Quality,* __ N.C. App. __, __, 736 S.E.2d 764, 767 (2012). The proper standard of review depends on the particular issues presented on appeal.

To this effect, our Supreme Court clarifies that:

these grounds for reversal or modification of an agency's final decision fall into two conceptual categories. The first four grounds for reversing or modifying an agency's decision—that the decision was "in violation of constitutional provisions," "in excess of the statutory authority or jurisdiction of the agency," "made upon unlawful procedure," or "affected by other error of law,"—may be characterized as "law-based" inquiries. The final two grounds—that the decision was "unsupported by substantial evidence . . . in view of the entire record" or "arbitrary or capricious," — may be characterized as "fact-based" inquiries.

*N.C. Dep't of Env't & Natural Res. v. Carroll,* 358 N.C. 649, 659, 599 S.E.2d 888, 894 (2004) (alteration in original)(internal citation omitted).

"Thus, where the gravamen of an assigned error is that the agency violated subsections 150B–51(b)(1), (2), (3), or (4) of the APA, a court engages in *de novo* review." *Id.* at 659, 599 S.E.2d at 895. "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the Commission." *Greens of Pine Glen Ltd.,* 356 N.C. at 647, 576 S.E.2d at 319 (internal citations omitted).

On the other hand, when the issue is whether (i) an agency's factual findings are supported by substantial evidence; or (ii) whether an agency's decision is arbitrary and capricious, we apply the "whole record" test. *See Carroll,* 358 N.C. at 659, 599 S.E.2d at 894. "When the trial court applies

the whole record test, . . . it may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*." *Id.* at 660, 599 S.E.2d at 895 (quotation marks and citation omitted). "Rather, a court must examine all the record evidence—that which detracts from the agency's findings and conclusions as well as that which tends to support them—to determine whether there is substantial evidence to justify the agency's decision." *Watkins v. N.C. State Bd. of Dental Examiners*, 358 N.C. 190, 199, 593 S.E.2d 764, 769 (2004). "Substantial evidence" is "relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B–2(8c) (2011).

Here, the trial court appropriately applied *de novo* review to the Commission's first variance factor determination. There, the only issue was whether The Riggings suffered "unnecessary hardships" as a matter of law. *See Carroll*, 358 N.C. at 659, 599 S.E.2d at 894 ("It is well settled that in cases appealed from administrative tribunals, [q]uestions of law receive *de novo* review." (alteration in original) (quotation marks and citation omitted)).

In its review of the Commission's fourth variance factor determination, the trial court noted that the Commission's order "comingles in the Conclusions of Law, many Findings of Fact that should not be included within the Conclusions of Law section." Consequently, in its fourth variance factor analysis the trial court appropriately applied: (i) the whole record test to determine whether the facts were supported by substantial evidence; and (ii) *de novo* review to the Commission's legal determinations under CAMA's statutory framework. On appeal, we apply the same standard of review.

### III. Analysis

On appeal, the Commission argues the trial court erred by determining The Riggings satisfied the first and fourth statutory variance factors. On cross-appeal, The Riggings argues: (i) the trial court erred in concluding the Commission did not need to make a "reasonable use" determination; (ii) the Commission's actions violate the takings doctrine; and (iii) the Commission's actions violate the separation of powers doctrine. Upon review, we affirm.

### A. Commission's Appeal

Preliminarily, we discuss the regulatory framework behind the instant case. The Commission's rules only allow "imminently threatened" buildings like The Riggings to seek one permit for temporary sandbag structures. *See* 15A N.C.A.C. 7H.1705(a)(14). After the permit's

expiration, "imminently threatened" buildings must seek a variance to maintain temporary sandbag structures. CAMA clarifies that:

> (a) Any person may petition the Commission for a variance granting permission to use the person's land in a manner otherwise prohibited by rules or standards prescribed by the Commission, or orders issued by the Commission, pursuant to this Article. To qualify for a variance, the petitioner must show all of the following:

> (1) Unnecessary hardships would result from strict application of the rules, standards, or orders.

> (2) The hardships result from conditions that are peculiar to the property, such as the location, size, or topography of the property.

> (3) The hardships did not result from actions taken by the petitioner.

> (4) The requested variance is consistent with the spirit, purpose, and intent of the rules, standards, or orders; will secure public safety and welfare; and will preserve substantial justice.

N.C. Gen. Stat. § 113A-120.1 (2011).

In the instant case, The Riggings applied for a variance under N.C. Gen. Stat. § 113A-120.1. The Commission held The Riggings satisfied the second and third variance factors, but not the first or fourth factors. The trial court reversed the Commission's first and fourth variance factor determinations, and the Commission appealed. Upon review, we affirm the trial court's decision.

## 1. First Variance Factor

· The Commission argues the trial court erred in its first variance factor determination by: (i) holding the Commission's statement that "erosion is stable" was prejudicial error; (ii) deciding the Commission improperly based its decision on the property-owner rather than the property; and (iii) misconstruing the phrase "unnecessary hardships." We find the Commission's arguments unpersuasive.

### a. "Erosion is stable"

[1] The Commission first argues the trial court erred by holding the Commission's statement that "erosion is stable" was prejudicial error. We disagree.

In its 21 May 2009 order, the Commission stated that "initially after construction of the Ft. Fisher revetment erosion increased at [The Riggings'] property, but now erosion is stable." It based this conclusion on the stipulated fact that after the stone revetment's construction "the rate of erosion of the shoreline in front of The Riggings increased, but since then the rate of erosion has decreased."

In its 1 June 2012 order, the trial court determined the Commission's statement was prejudicial error. To support this holding, the trial court cited several stipulated facts indicating erosion still occurred. For instance, the trial court referenced Stipulated Fact No. 10, which stated "The Riggings has been threatened by erosion since 1985, and a sandbag revetment has been used to protect it since that time." It also mentioned Stipulated Fact No. 18, which stated that "erosion of the shoreline in front of the Riggings increased [after the construction of the Fort Fisher revetment], but since then the rate of erosion has decreased."

Upon review, we believe any disagreement arises from mutual misunderstanding rather than disputed legal principles. Specifically, the Commission's statement referenced the rate of erosion. Under this interpretation, its statement is supported by the facts: the rate of erosion initially increased after the construction of the Fort Fisher revetment, but then stabilized. The trial court, on the other hand, interpreted the Commission's statement to imply erosion no longer occurs. It then cited competent evidence showing erosion still occurs.

Based on this analysis, we affirm the trial court's determination to the extent it reverses a statement that erosion no longer occurs.

### b. Property-Owner vs. Property

[2] Next, the Commission argues the trial court erred by holding the Commission improperly based its first variance factor determination on the property-owner rather than the property. We disagree.

In its first variance factor analysis, the Commission may only consider its rules' effect on the petitioner's property, not the petitioner itself. *Williams v. N.C. Dep't of Env't and Natural Res.*, 144 N.C. App. 479, 548 S.E.2d 793 (2001). For instance, in *Williams* a landowner applied for a variance to build a "fast freezer" and storage unit on his property. *Id.* at 481–82, 548 S.E.2d at 795–96. However, the proposed project would have damaged adjacent wetlands. *Id.* at 488, 548 S.E.2d at 799. Moreover, the petitioner owned other properties where he could complete the project without potential wetlands damage. *Id.* In *Williams*, the Commission determined the petitioner did not prove "unnecessary hardships"

because "alternatives for sitting and design of the proposed facility exist that would reduce or eliminate the wetlands impacts of the project." *Id.* at 482, 548 S.E.2d at 796. The trial court reversed. *Id.*

On appeal, this Court affirmed the trial court. *Id.* at 485, 548 S.E.2d at 797–98. We elaborated that:

> [w]hether strict application of the Coastal Area Management Act, (hereinafter "CAMA"), places an "unnecessary hardship" on a parcel of property, depends upon the unique nature of the property; not the landowner. If "hardship" stemmed from the situation of the landowner, then those persons owning less land would have an easier time showing unnecessary hardship than those owning more than one parcel of land. Similarly situated persons would be treated differently, giving rise to equal protection of law issues.

*Id.* at 485, 548 S.E.2d at 797.

In the present case, the Commission appeals the trial court's reversal of its first variance factor determination. Specifically, it argues any hardship The Riggings suffers is necessary due to the Commission's prohibition of permanent erosion control structures. Based on *Williams*, we affirm the trial court's decision.

In its 21 May 2009 order, the Commission described how The Riggings had maintained the sandbags since 1985, over the course of a permit and four variances. Based on this length of time, the Commission then determined the sandbags had impermissibly become *de facto* permanent structures. Given this conclusion, the Commission ultimately decided any hardship The Riggings now suffered was necessary to uphold the regulatory prohibition of permanent erosion control structures. *See* N.C. Gen. Stat. § 113A-115.1(b) (2011); 15A N.C.A.C. 7M.0202(e).

However, the Commission improperly focused its analysis on the property-owner rather than the property. The Riggings' previous permit and variances are immaterial to the Commission's "unnecessary hardships" analysis. *See Williams*, 144 N.C. App. at 485, 548 S.E.2d at 797–98. As we held in *Williams*, "[i]f 'hardship' stemmed from the situation of the landowner" rather than the property itself, "[s]imilarly situated persons would be treated differently." *Id.* at 485, 548 S.E.2d at 797. For instance, under the Commission's logic someone who had not previously received variances but owned property identical to The Riggings' property would receive different treatment. Like in *Williams*, this would raise *prima facie* equal protection issues.

Consequently, we affirm the trial court's "unnecessary hardships" determination under *Williams*.

### c. "Unnecessary" Hardships

**[3]** Next, the Commission argues the trial court erred by determining "it is not possible to have hardships [under the second and third variance factors] but not unnecessary hardships [under the first variance factor]." Upon review, we conclude any error was non-prejudicial.

In its 21 May 2009 order, the Commission determined The Riggings suffered "hardships" under the second and third variance factors, but not "unnecessary hardships" under the first variance factor. As discussed previously, the Commission based its "unnecessary hardships" determination on its prohibition against permanent erosion control structures. However, the trial court determined "it is not possible to have hardships but not unnecessary hardships."

On appeal to this Court, the Commission contends the trial court's determination would render the word "unnecessary" superfluous. Thus, the Commission argues the trial court erred in its interpretation of N.C. Gen. Stat. § 113A-120.1 (2011). *See HCA Crossroads Residential Ctrs. v. N.C. Dep't of Human Res.*, 327 N.C. 573, 578, 398 S.E.2d 466, 470 (1990) ("Such statutory construction is not permitted, because a statute must be construed, if possible, to give meaning and effect to all of its provisions.").

Since we affirm the trial court's "unnecessary hardships" determination under *Williams*, any error the trial court committed by stating "it is not possible to have hardships but not unnecessary hardships" is non-prejudicial. *Rea v. Simowitz*, 226 N.C. 379, 383, 38 S.E.2d 194, 197 (1946) ("It is an established rule of appellate practice that the burden is on the appellant not only to show error but also to show that he was prejudiced."). Regardless of the trial court's statement, The Riggings suffered "unnecessary hardships."

Consequently, we decline to further address this argument.

### 2. Fourth Variance Factor

**[4]** The Commission next argues the trial court erred by holding The Riggings satisfied the fourth variance factor.[5] Specifically, The Riggings argues the trial court erred by: (i) failing to consider the Commission's

---

5. The fourth variance factor states, "The requested variance is consistent with the spirit, purpose, and intent of the rules, standards, or orders; will secure public safety and welfare; and will preserve substantial justice." N.C. Gen. Stat. § 113A-120.1(a)(4) (2011).

rules; and (ii) substituting its own judgment for that of the Commission. Since both arguments concern the same variance factor, we consider them together. Upon review, we affirm the result of the trial court's decision.

North Carolina's Constitution recognizes the importance of our state's coastal areas:

> It shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end it shall be a proper function of the State of North Carolina . . . to preserve as a part of the common heritage of this State its . . . beaches . . . and places of beauty.

N.C. Const. art. XIV, § 5. Accordingly, in 1974 our General Assembly adopted The Coastal Area Management Act because "an immediate and pressing need exists to establish a comprehensive plan for the protection, preservation, orderly development, and management of the coastal area of North Carolina." N.C. Gen. Stat. § 113A-102(a) (2011). CAMA has, *inter alia*, the following goal:

> (4) To establish policies, guidelines and standards for:
>
> a.   Protection, preservation, and conservation of natural resources including but not limited to water use, scenic vistas, and fish and wildlife; and management of transitional or intensely developed areas and areas especially suited to intensive use or development, as well as areas of significant natural value;
>
> b.   The economic development of the coastal area, including but not limited to construction, location and design of industries, port facilities, commercial establishments and other developments.

N.C. Gen. Stat. § 113A-102(b) (2011). Thus, CAMA seeks to balance public interests with private property interests. *See id.*

To accomplish its goals, CAMA established the North Carolina Coastal Resources Commission. N.C. Gen. Stat. § 113A-104 (2011). The Commission's rules recognize its role in balancing private property interests with competing public interests:

> It is hereby declared that the general welfare and public interest require that development along the ocean and estuarine shorelines be conducted in a manner that avoids loss of life, property and amenities. It is also declared that

protection of the recreational use of the shorelines of the state is in the public interest. In order to accomplish these public purposes, the planning of future land uses, reasonable rules and public expenditures should be created or accomplished in a coordinated manner so as to minimize the likelihood of damage to private and public resources resulting from recognized coastal hazards.

15A N.C.A.C. 7M.0201.

One way CAMA protects our coasts is by prohibiting the construction of "permanent erosion control structure[s] in an ocean shoreline." N.C. Gen. Stat. § 113A-115.1(b) (2011). Additionally, CAMA prohibits "the construction of a temporary erosion control structure that consists of anything other than sandbags in an ocean shoreline." *Id.* CAMA authorizes the Commission to regulate temporary sandbag structures. *Id.*

The Commission adopted several administrative rules regulating temporary sandbag structures. *See* N.C. Gen. Stat. § 113A-115.1(b1) (2011). For instance,

[t]emporary measures to counteract erosion, such as the use of sandbags and beach pushing, should be allowed, but only to the extent necessary to protect property for a short period of time until threatened structures may be relocated or until the effects of a short-term erosion event are reversed. In all cases, temporary stabilization measures must be compatible with public use and enjoyment of the beach.

15A N.C.A.C. 7M.0202(e); *see also* 15A N.C.A.C. 7H.1701, 15A N.C.A.C. 7H.1702. The Commission's rules further regulate temporary sandbag structures as to: (i) situation; (ii) location; and (iii) time. *See* 15A N.C.A.C. 7H.0308(a)(2).

In the present case, the Commission argues the trial court erred by determining The Riggings satisfied the fourth variance factor. We disagree.

In its 21 May 2009 order, the Commission engaged in the following fourth variance factor analysis:

The proposed variance is inconsistent with the spirit purpose, and intent of the [Commission's] rules because sandbags are intended to be a temporary erosion control structure and this sandbag revetment has been in place for

almost 24 years. . . . Additionally, the [Commission] con-
cludes as a matter of law that the situation with the sandbag
revetment protecting [The Riggings'] structures does not
secure public safety and welfare. Depending on the vari-
able nature of the beach profile sometimes the sandbags
are buried and sometimes exposed, sometimes that public
has to detour landward around the sandbags depending on
the beach profile and the tide, and there has been at least
one instance during this 24-year placement when holes in
the sandbag revetment had to be filled with other sandbags.
. . . Finally, allowing these sandbags to remain to protect
[The Riggings'] structures over an even greater period of
time will not preserve substantial justice because both the
legislature and the [Commission's] intent for the use of
sandbags is as a temporary erosion control structure.

The Commission based this determination on the "substantial evidence
in the record." The trial court then reversed and remanded because it
determined: (i) the Commission's fourth variance factor analysis is not
supported by substantial evidence; and (ii) there is substantial evidence
to grant the variance. The Commission now contends the trial court
erred because The Riggings' variance request does not satisfy the fourth
variance factor.

To better analyze the Commission's argument, we rely on several can-
ons of statutory construction. First, our Supreme Court describes how:

[w]here there is one statute dealing with a subject in gen-
eral and comprehensive terms, and another dealing with
a part of the same subject in a more minute and definite
way, the two should be read together and harmonized, if
possible, with a view to giving effect to a consistent legisla-
tive policy; but, to the extent of any necessary repugnancy
between them, the special statute, or the one dealing with
the common subject matter in a minute way, will prevail
over the general statute, according to the authorities on the
question, *unless it appears that the legislature intended
to make the general act controlling*[.]

*McIntyre v. McIntyre*, 341 N.C. 629, 631, 461 S.E.2d 745, 747 (1995)
(quotation marks and citation omitted)(emphasis added). Furthermore,
"statutes *in pari materia,* and all parts thereof, should be construed
together and compared with each other." *In re Declaratory Ruling by
N.C. Comm'r of Ins. Regarding 11 N.C.A.C. 12.0319,* 134 N.C. App.

22, 27, 517 S.E.2d 134, 139 (1999). "Such statutes should be reconciled with each other when possible, and any irreconcilable ambiguity should be resolved so as to effectuate the true legislative intent." *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 300 N.C. 381, 400, 269 S.E.2d 547, 561 (1980). Lastly, our Supreme Court expressly warns:

> an agency having authority to effectuate the policies of a particular statute may not effectuate such policies so singlemindedly that it wholly ignores other and equally important legislative objectives. This is especially true in the case of agencies which have both accusatorial and judgmental powers. The potential for unfairness and abuse is obvious in a situation in which an administrative officer is vested with broad rulemaking powers, determining the admissibility and weight of evidence in hearings and making the final determination on the merits of an action.

*Id.* at 409, 269 S.E.2d at 566.

In light of this discussion, we now analyze whether the requested variance satisfies the fourth variance factor.

CAMA establishes the Commission and expressly grants it the ability "to adopt rules to designate or protect areas of environmental concern, to govern the use of sandbags, or to govern the use of erosion control structures in estuarine shorelines." N.C. Gen. Stat. §§ 113A-104 and 113A-115.1(b1) (2011). Thus, the Commission clearly has the authority to make determinations regarding temporary sandbag structures. *See id.* However, we must analyze this statutory authority in the context of CAMA's other provisions. *See In re Declaratory Ruling*, 134 N.C. App. at 27, 517 S.E.2d at 139. To this effect, both CAMA and the Commission's own rules recognize a necessary balance between private property interests and competing public interests. *See* N.C. Gen. Stat. § 113A-102 (2011); 15A N.C.A.C. 7M.0201. Given this legislative intent, we recognize that the Commission's fourth variance factor analysis will inherently contemplate some form of balancing.

We acknowledge the logistical difficulties of balancing private property interests with competing public interests. Indeed,

> [i]t is important to reiterate that there can be no truly optimal environmental governance because resource management as well as public health and ecological protection involve to some degree measuring the unmeasurable and comparing the incomparable. Optimizing one set of virtues

will often entail compromising on other values. Many environmental problems have at their core questions over which people do not—and need not—agree. At this level, the policy process is art, not science.

Daniel C. Esty, *Toward Optimal Environmental Governance*, 74 N.Y.U. L. Rev. 1495, 1519 (1999). However, administrative agencies like the Commission must engage in this type of balancing to promote fair governance:

> [T]he environmental policymaking process can be sharpened through improved governance. Indeed, a well-functioning regulatory system will generate information and analysis to inform decisionmakers, isolate the value judgments that must be made, highlight the assumptions on which decisions might turn, and tee up the critical political questions for decision in a fair and unbiased way. By reducing the zone of technical uncertainty, better decisionmaking structures and procedures narrow the range of policy disputes.

*Id.* Otherwise, without guidance as to "the assumptions on which [variance] decisions might turn," petitioners like The Riggings would be unable to make effective, informed variance requests.

Based on this discussion, we interpret the Commission's fourth variance factor analysis to implicitly balance The Riggings' private property interest with competing public interests. We construe the Commission's balancing analysis as follows.

First, the Commission recognized The Riggings' private property interest: The Riggings has been threatened by erosion since 1985 and uses the sandbags to protect its condos against this erosion. Next, the Commission balanced this private property interest with competing public interests.

For instance, the Commission considered how the sandbags may at some point impermissibly become *de facto* permanent structures. As a public policy determination, CAMA's regulatory framework expressly prohibits permanent structures. *See* N.C. Gen. Stat. § 113A-115.1(b) (2011); 15A N.C.A.C. 7M.0202(e). Furthermore, the Commission referenced aesthetic concerns because "sometimes the sandbags are . . . exposed." Lastly, the Commission described how "sometimes the public has to detour landward around the sandbags depending on the beach profile and the tide.

Still, the Commission conceded that "even at high tide the public can get around the sandbags by going between the sandbags and The Riggings buildings closest to the ocean." Additionally, the Commission noted that "[a] former member of the U.S. Army Corps of Engineers is on record as stating that [T]he Riggings sandbags have not had any deleterious effect on surrounding property nor have they come into contact with the Atlantic Ocean except during major storm events."

Given the Commission's decision to deny the variance, it is clear the Commission's order balanced these issues in favor of public interests. Since the trial court reversed the Commission, the trial court inherently balanced the competing interests differently. As a question of law, we review these balancing determinations de novo.[6] See Carroll, 358 N.C. at 659, 599 S.E.2d at 895. Upon review, we conclude The Riggings' private property interest outweighs the public interests considered by the Commission.

Here, The Riggings has a substantial private property interest. If the sandbags are removed, the condos face potential destruction from erosion. We now weigh this private property interest against the public interests considered by the Commission: (i) CAMA's prohibition of permanent erosion control structures; (ii) aesthetic concerns; and (iii) public beach access.

First, although CAMA's framework prohibits permanent structures, the sandbags have not yet become de facto permanent structures. We do not dispute the importance of CAMA's prohibition against permanent erosion control structures. See Pamlico Marine Co. v. N.C. Dep't of Natural Res. & Cmty. Dev., 80 N.C. App. 201, 206, 341 S.E.2d 108, 112 (1986) ("[A]n administrative agency's interpretation of its own regulation is to be given due deference by the courts unless it is plainly erroneous or inconsistent with the regulation."). However, in its latest variance petition, The Riggings proposed a new beach renourishment solution, the Habitat Enhancement Project. If this solution is successful, The Riggings

---

6. In her dissent, Judge Bryant contends both this Court and the trial court should have applied the whole record test, not de novo review, to examine the Commission's fourth variance factor determination. However, we do not dispute the Commission's factual determinations. See Carroll, 358 N.C. at 659, 599 S.E.2d at 894 ("It is well settled that in cases appealed from administrative tribunals, . . . fact-intensive issues such as sufficiency of the evidence to support [an agency's] decision are reviewed under the whole-record test." (alteration in original)(quotation marks and citation omitted)). Instead, we analyze as a matter of law whether the Commission appropriately balanced competing policy concerns under CAMA's statutory framework. See N.C. Gen. Stat. § 150B-51(b)(2) and (4) (2011) Consequently, we apply de novo review. See Carroll, 358 N.C. at 659, 599 S.E.2d at 894.

would no longer need the sandbags. When The Riggings still seeks alternative erosion solutions, the Commission's prohibition of permanent structures does not outweigh The Riggings' private property interest.

Second, we acknowledge the intrinsic natural beauty of our state's coasts. See N.C. Const. art. XIV, § 5. However, this aesthetic importance does not override all competing interests. With 98% of Kure Beach renourished, the public has ample opportunity to enjoy nearby beaches. The public's interest in enjoying the aesthetics of The Riggings' beachfront does not outweigh The Riggings' private property interest.

Lastly, we consider the public's interest in beach access. Here, although the public may have to walk around the sandbags, the sandbags do not completely prohibit beach access. Indeed, "even at high tide, the public can get around the sandbags by going between the sandbags and The Riggings buildings closest to the ocean." Furthermore, the Fort Fisher stone revetment blocks the public from proceeding beyond The Riggings' beachfront. Thus, the public's need to pass through The Riggings' beachfront is minimal.

In sum, we believe The Riggings' substantial private property interest outweighs the competing public interests considered by the Commission. Consequently, we affirm the trial court's reversal of the Commission's fourth variance factor determination in result.

### B. Petitioner's Cross-Appeal

On cross-appeal, The Riggings argues: (i) the trial court erred in concluding the Commission did not need to make factual findings regarding reasonable use of the property; (ii) the Commission's actions violate the takings doctrine; and (iii) the Commission's actions violate the separation of powers doctrine. Upon review, we affirm.

### 1. Reasonable Use

[5] The Riggings first argues the trial court erred by deciding the Commission did not need to make factual findings regarding the reasonable use of the property. We disagree.

The Riggings primarily relies on *Williams* for this argument. In *Williams*, the petitioner appealed the Commission's denial of his variance request. 144 N.C. App. at 481, 548 S.E.2d at 795. There, we determined the Commission erred in its first variance factor analysis because it failed to "make findings of fact and conclusions of law as to the impact of the act on the landowner's ability to make a reasonable use of his property." *Id.* at 487, 548 S.E.2d at 798.

However, in *Williams* we applied an older version of N.C. Gen. Stat. § 113A-120.1 that stated:

> Any person may petition the Commission for a variance granting permission to use his land in a manner otherwise prohibited by rules, standards, or limitations prescribed by the Commission, or orders issued by the Commission, pursuant to this Article. *When it finds* that (i) practical difficulties or unnecessary hardships would result from strict application of the guidelines, rules, standards or other restrictions applicable to the property [and makes other specific findings, a variance may be granted.]

N.C. Gen. Stat. § 113A-120.1 (1989) (emphasis added). Shortly after we decided *Williams,* our General Assembly amended N.C. Gen. Stat. § 113A-120.1 to state:

> Any person may petition the Commission for a variance granting permission to use the person's land in a manner otherwise prohibited by rules or standards prescribed the Commission, or orders issued by the Commission, pursuant to this Article. To qualify for a variance, *the petitioner must show* all of the following: (1) Unnecessary hardships would result from strict application of the rules, standards, or orders.

N.C. Gen. Stat. § 113A-120.1(a) (2011) (emphasis added). This amendment shifted the burden of proving the four variance factors to petitioners. Consequently, now the Commission does not need to make a "reasonable use" determination before denying a variance request.

The Riggings also erroneously relies on *Elkins v. City of Greensboro, Bd. of Adjustment,* 2005 WL 2429808 (N.C. Ct. App. 4 Oct. 2005), and *Robertson v. Zoning Bd. of Adjustment for Charlotte,* 167 N.C. App. 531, 605 S.E.2d 723 (2004).

In *Elkins,* the petitioner appealed the denial of a zoning variance to build a church parking lot. 2005 WL at *1. There, we reversed and remanded because the zoning board did not make a "reasonable use" determination. *Id.* at *4. However, *Elkins* is inapplicable to the instant case for two reasons. First, since *Elkins* is an unpublished case, it "is not controlling legal authority." *Cary Creek Ltd. P'ship v. Town of Cary,* 203 N.C. App. 99, 106, 690 S.E.2d 549, 554 (2010) (quotation marks and citation omitted); *see also* N.C. R. App. P. 30(e)(3). Second, the regulation at issue in *Elkins,* Greensboro Ordinance § 30-9-6.10(D), provided that

"The Board may [grant a variance] *if it finds* that: (a) If the applicant complies with the provisions of this Ordinance, he can make no reasonable use of his property." 2005 WL at *2 (emphasis added). There, unlike in the instant case, the zoning board was required to make a "reasonable use" determination.

In *Robertson*, the petitioner appealed a city zoning board's denial of his variance request. 167 N.C. App. at 531, 605 S.E.2d at 724. There, the petitioner erroneously relied on *Williams* to argue the zoning board did not need to make an "unnecessary hardships" determination. *Id.* at 538, 605 S.E.2d at 728. On appeal, this Court cited *Williams* to support its holding that the zoning board had to make an "unnecessary hardships" determination. *Id.* Since the *Robertson* court did not cite *Williams* for its "reasonable use" proposition, *Robertson* is not applicable here.

Consequently, *Williams*, *Elkins*, and *Robertson* do not support The Riggings' argument. The trial court did not err in determining the Commission did not need to make a "reasonable use" determination.

## 2. Takings Doctrine

[6] Next, The Riggings contends the Commission's denial of its variance request constitutes an impermissible taking. Upon review, we determine this issue is not ripe for review.

In North Carolina, "land-use challenges are not ripe for review until there has been a final decision about what uses of the property will be permitted." *Messer v. Town of Chapel Hill*, 125 N.C. App. 57, 61, 479 S.E.2d 221, 223, *vacated on other grounds*, 346 N.C. 259, 485 S.E.2d 269 (1997). For takings claims,

> [t]his rule is compelled by the very nature of the inquiry required by the Just Compensation Clause, because the factors applied in deciding a takings claim simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

*Id.* (quotation marks and citation omitted).

In the present case, we have affirmed the trial court's decision to reverse and remand. As such, The Riggings' takings claim is not ripe because there has not yet been a final variance decision. *See Cary Creek Ltd. P'ship*, 203 N.C. App. at 102, 690 S.E.2d at 552; *Cardwell v. Smith*, 92 N.C. App. 505, 508, 374 S.E.2d 625, 627 (1988) ("As of the date of the case *sub judice* being filed on appeal, the Zoning Board had not complied

with this Court's mandate . . . . To answer [a question of ripeness], it is necessary to have a final determination of the validity of the special use permit originally granted.").

Consequently, since there has not yet been a final variance decision, the trial court did not err by determining The Riggings' takings claim is not yet ripe.

### 3. Separation of Powers Doctrine

[7] Lastly, The Riggings argues the Commission violated the separation of powers doctrine because it acted in a quasi-legislative and quasi-judicial capacity. We disagree.

In North Carolina, it is well-established that our legislature may delegate rule-making power to administrative agencies as long as it provides sufficient guiding standards. *See Adams v. N.C. Dep't of Natural & Econ. Res.*, 295 N.C. 683, 697, 249 S.E.2d 402, 410 (1978). In *Adams*, our Supreme Court explicitly determined the Commission's creation under CAMA is a constitutional delegation of legislative power. *See id.* at 702, 249 S.E.2d at 413. Similarly, in *In re Civil Penalty*, 324 N.C. 373, 379 S.E.2d 30 (1989), our Supreme Court determined Article IV, § 3 of our state's Constitution allows an administrative agency to take on discretionary judicial authority when "reasonably necessary to accomplish the agency's purposes." *Id.* at 379, 379 S.E.2d at 34.

Given the clear precedent of *Adams* and *Civil Penalty*, we determine The Riggings' separation of powers argument is without merit. *See Dunn v. Pate*, 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1993) ("[The Court of Appeals] has no authority to overrule decisions of [the] Supreme Court and [has] the responsibility to follow those decisions until otherwise ordered by the Supreme Court." (quotation marks and citation omitted) (second and third alterations in original)). First, *Adams* already determines the Commission's creation under CAMA is a constitutional delegation of legislative power. *See Adams*, 295 N.C. at 702, 249 S.E.2d at 413. Second, since N.C. Gen. Stat. § 113A-120.1(a) explicitly contemplates the Commission's issuance of variances, we believe it is self-evident that judicial authority to rule on variance requests is "reasonably necessary" to accomplish the Commission's statutory purpose.

Therefore, we hold the trial court did not err in determining the Commission's actions did not violate the separation of powers doctrine.

### IV. Conclusion

With a rock revetment to the south, and depleted coquina formations to the north, The Riggings truly is caught between a rock and a hard

place. In this scenario, we must balance The Riggings' private property interest with competing public interests to determine whether a variance is consistent with the "spirit, purpose, and intent" of CAMA's framework. Without a variance, The Riggings' condos will likely be destroyed by erosion. We believe this private property interest outweighs competing public interests. Consequently, the trial court's decision is

AFFIRMED.

Judge McCULLOUGH concurs.

BRYANT, Judge, concurring in part, dissenting in part.

The majority opinion reviews and affirms the order of the trial court reversing and remanding the denial of a variance to the North Carolina Coastal Resources Commission ("CRC") for a new hearing. In so doing the majority determines that the trial court applied the correct standard of review to the issues before it, and that the trial court's review of these issues was properly conducted. While I believe the trial court applied the correct standard of review and did so properly as to the first issue we review on appeal, I do not believe the trial court properly applied the correct standard of review to the second issue. Therefore, I concur in the portion of the majority opinion affirming the trial court's review and determination as to the first variance factor. However, I must dissent from the portion of the majority opinion affirming the trial court's analysis and ruling as to the fourth variance factor.

In the portion of its order regarding "The Issues for Appeal," the trial court set out the standard of review it used for each issue as follows:

> (I) Whether the CRC erred in its Conclusion of Law 3(b) that the Petition did not demonstrate that strict application of 15A NCAC 7H.1705 (a)(7) would result in an unnecessary hardship to the Riggings Property per N.C. Gen. Stat. 113A-120.1(a)(1). *On this issue the Court used the de novo review standard.*

> (II) Whether the CRC erred in its Conclusion of Law 6 that the Petitioners did not meet the fourth requirement of a variance request that the granting of the variance is consistent with the spirit, purpose and intent of the rules, standards, or order; will secure public safety and welfare; will preserve substantial justice per N.C. Gen. Stat. 113A-120.1(a)(4); and that the decision of the CRC is

> supported by substantial evidence. *On this issue the Court used the Whole Record review standard on the issues of substantial evidence and de novo standard on the other issues.*

(emphasis added).

As to Issue I, I agree that the trial court used the correct standard of review – de novo. However, as to Issue II, the trial court stated that it would use both whole record review and de novo review in analyzing the fourth variance factor. Based on the trial court's analysis, almost all of which related to stipulated findings of fact from the Commission's order as well as the trial court's independent findings of fact, it appears the trial court used the whole record test exclusively. Notwithstanding the trial court's statement that it would use both de novo and whole record review in analyzing the requirements of the fourth variance, I see nothing to indicate the trial court used anything other than whole record review. And, while I think the whole record review is the correct standard to use, I do not think the trial court used it correctly.

Under whole record review the trial court must examine the whole record to determine whether there is substantial evidence to support the agency's decision. *ACT-UP Triangle v. Commission for Health Servs.*, 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (citation omitted). Unlike de novo review, under whole record review the trial court is not allowed to substitute its judgment for that of the agency. *Meza v. Div. of Soc. Servs. & Div. of Med. Assistance of the N.C. HHS*, 364 N.C. 61, 69-70, 692 S.E.2d 96, 102 (2010). Even if, as here, the trial court could have reached a different result de novo, it "may not substitute its judgment for the agency's as between two conflicting views[.]" *Id.*

Because it appears the trial court improperly substituted its own judgment on whole record review, I believe the decision was reached under a misapprehension of the correct standard of review. Further, a correct application of a whole record review to the facts of this case could result in a determination that there exists substantial evidence to justify upholding the agency decision.

Therefore, I would reverse and remand to the trial court to properly apply the correct standard of review.